UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 12-2867-Goodman

UNITED STATES OF AMERICA

vs.

THOMAS PATRICK KEELAN,

        Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? \_\_\_\_ Yes  \_x\_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? \_\_\_\_ Yes  \_x\_ No

        Respectfully submitted,

        WIFREDO A. FERRER
        UNITED STATES ATTORNEY

BY: _____
      ROY K. ALTMAN
      ASSISTANT UNITED STATES ATTORNEY
      Court No.: A5501214
      99 N. E. 4th Street
      Miami, Florida 33132-2111
      TEL (305) 961-9435
      FAX (305) 530-7976
      Email: Roy.Altman@usdoj.gov

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**SOUTHERN** DISTRICT OF **FLORIDA**

UNITED STATES OF AMERICA

V.

THOMAS PATRICK KEELAN,

CRIMINAL COMPLAINT

CASE NUMBER: 12-2867-Goodman

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Between in or around May 2012, and continuing through on or about June 16, 2012, the defendant, THOMAS PATRICK KEELAN, using the mail or any facility or means of interstate commerce, did attempt to knowingly persuade, induce, entice, or coerce an individual who has not attained the age of 18 years to engage in sexual activity for which a person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2422(b); and did knowingly travel in interstate commerce for the purpose of engaging in illicit sexual conduct with another person, in violation of Title 18, United States Code, Section 2423(b).

I further state that I am a Special Agent with the Federal Bureau of Investigation (FBI), and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

ALEXIS CARPINTERI, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me, and subscribed in my presence,

June 16, 2012                                            at   Miami, Florida
Date                                                          City and State

JONATHAN GOODMAN
United States Magistrate Judge
Name and Title of Judicial Officer                            Signature of Judicial Officer

## AFFIDAVIT

I, Alexis Carpinteri, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since January 1997. I am thus an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code. That is, I am an officer of the United States who is empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18, United States Code, Section 2242(a) and Title 18, United States Code, Section 2423 et seq.

2. I am currently assigned to the investigation of cases involving crimes against children. These investigations have included the use of surveillance techniques, undercover activities, the interviewing of subjects and witnesses, and the planning and execution of search, arrest, and seizure warrants. I have participated in investigations involving sexual assaults, pedophiles, preferential child molesters, persons who collect and distribute child pornography, and the importation and distribution of materials relating to the sexual exploitation of children. I have received training from the FBI in the areas of sexual assaults and child exploitation, and I have reviewed thousands of images and videos of child pornography in a wide variety of media forms, including computer media. I have also discussed and reviewed these materials with other law enforcement officers.

3. This affidavit is based on my own personal knowledge, as well as information provided to me by others. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to the Government about this investigation. Instead, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested criminal complaint.

4. As set forth below, there is probable cause to believe that **THOMAS PATRICK KEELAN**, using the mail or any facility or means of interstate commerce, did attempt to knowingly persuade, induce, entice, or coerce an individual who has not attained the age of 18 years to engage in sexual activity for which a person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2422(b); and did knowingly travel in interstate commerce for the purpose of engaging in illicit sexual conduct with another person, in violation of Title 18, United States Code, Section 2423(b).

## SUMMARY OF INVESTIGATION

5. On May 9, 2012, a minor male victim ("the victim") was interviewed by Florida Department of Law Enforcement (FDLE) Special Agents (SAs) Donald Cannon and Kelly Rawson regarding his involvement with an adult male identified as **THOMAS PATRICK KEELAN**. During the interview, the victim provided the following information regarding his previous interactions with **KEELAN**:

   a. During the school year of 2009-2010, the victim was 15 years old and a student at a private school located in Miami Beach, Florida.

   b. **KEELAN** was one of the victim's teachers at the school.

   c. **KEELAN** initiated a friendship with the victim outside of the classroom.

   d. **KEELAN** sent text messages to the victim's cellphone. At first, the text messages contained mundane and everyday comments.

   e. At that time, the victim was a teenager who suffered from low self-esteem and depression. The victim often confided in **KEELAN** and was comforted by the friendship and support that **KEELAN** provided him. This was a vulnerable and difficult time for the victim, and **KEELAN** convinced the victim that **KEELAN** was the victim's only true

friend and confidant. The victim believed that **KEELAN** cared deeply for him, and, in turn, the victim placed his trust in **KEELAN**.

f.  After **KEELAN** gained the trust and confidence of the victim, the tone of **KEELAN's** text messages began to change and would often contain flirtatious comments filled with sexual innuendos. When **KEELAN** realized that the victim seemed comfortable with the tone of the text messages, he began sending text messages that directly addressed sexual activity between **KEELAN** and the victim.

g.  After some time, **KEELAN** sent a text message to the victim's cellphone and asked the victim if he wanted to "have sex" with **KEELAN**. At that time, the victim was 15 years old and was confused about his sexuality. **KEELAN** arranged to meet the victim and take the victim back to **KEELAN**'s apartment, which, at the time, was located in North Miami, Florida. At **KEELAN's** apartment, **KEELAN** continued to talk to the victim about having sex, but he and the victim did not engage in any sexual activity.

h.  The next day, **KEELAN** again met with the victim and drove the victim back to **KEELAN**'s apartment. This time, **KEELAN** kissed the victim and fondled the victim's penis. **KEELAN** then performed oral sex on the victim and had the victim perform oral sex on him. **KEELAN** instructed the victim not to disclose their relationship or sexual activity to anyone.

i.  In the next school year (2010-2011), the victim did not return to the private school in Miami Beach, Florida, but attended a public high school located in North Miami Beach, Florida. **KEELAN** continued to contact the victim, both via text messages sent from his cell phone and emails sent over the Internet.

j.  Over that next year, **KEELAN** engaged in sexual activity (including oral sex and anal sex) with the victim approximately 60 times. Most of the time, **KEELAN** arranged to meet the victim near the victim's residence and drove the victim back to his apartment to engage in sexual activity.

k.  One time, however, **KEELAN** brought the victim to Oleta River State Park in North Miami, Florida, where **KEELAN** and the victim rented kayaks and paddled to a secluded island in that state park. On the secluded island, **KEELAN** engaged in sexual activity with the victim.

l.  On August 1, 2010, **KEELAN** rented a room at the Golden Glades Hotel in North Miami Beach, Florida. **KEELAN** then met the victim and brought the victim to the rented room. Inside the room, **KEELAN** engaged in sexual activity with the victim, who was still 15 years old.

m.  In the Fall of 2010, **KEELAN** received a teaching position at a private high school in Roanoke, Virginia and relocated to Roanoke, Virginia. **KEELAN** is now the director of that school's English and Fine Arts Departments. **KEELAN** continued to contact the victim, both via text messages sent from his cell phone and emails sent over the Internet.

n.  In December of 2010, **KEELAN** returned to South Florida and rented a room at the Holiday Gateway Inn in Hollywood, Florida. **KEELAN** again met with the victim and brought the victim back to the rented room. Inside the room, **KEELAN** engaged in sexual activity with the victim, who was, by then, 16 years old.

o.  On at least one occasion, **KEELAN** instructed the victim to pose in lewd and lascivious positions and then photographed the victim. During this photo shoot, **KEELAN** photographed the victim while the victim masturbated. On that day, **KEELAN**, using his

laptop computer, signed into a child pornography website, and showed the victim child pornography images that depicted nude male children who were approximately the same age as the victim.

p. In May of 2011, the victim's parents became aware of the victim's relationship with **KEELAN**. To protect the victim, the victim's parents placed the victim in the care of private educational institutions outside of the State of Florida.

6. While the victim was away, the victim's parents gave law enforcement consent to utilize and control the email address the victim had used to communicate with **KEELAN**. By reviewing the victim's emails, law enforcement determined that **KEELAN** used the email address fox58@cox.net to communicate with the victim.

7. Starting in August of 2011, law enforcement, using the victim's email account and pretending to be the victim, sent **KEELAN** several emails. **KEELAN** became suspicious of the emails and indicated that he knew the emails had not come from the victim because he knew the victim's "speech patterns." **KEELAN** added that he wanted to talk to the victim over the phone and to hear the victim's voice before he would be willing to communicate over email.

8. In May of 2012, the victim, now 17 years old, returned to South Florida and agreed to cooperate with this investigation. On May 9, 2012, the victim, working with law enforcement, wrote **KEELAN** an email that, unlike the earlier emails law enforcement had sent, contained the "codes" he and KEELAN used to express their feelings and confirm their identities to one another. **KEELAN** replied to that email and agreed to talk to the victim over the phone.

9. On May 10, 2012, **KEELAN**, using a fictitious cell phone number, called the victim. This call was monitored by law enforcement and recorded. **KEELAN** questioned the victim about the earlier un-coded emails and demanded an explanation. The victim told **KEELAN** that he had sent

those confusing emails because he was angry, confused, and had been drinking heavily. The victim apologized for the confusion. During the conversation, **KEELAN**, who told the victim that he was afraid that the victim might get him in trouble, stated: "What if [Victim] really wants me arrested to be better? Then I have to figure out, am I gonna face that or not face that." Towards the end of the call, **KEELAN** and the victim agreed to maintain contact through the cellphones and emails. **KEELAN** then gave the victim his cell phone number: 540-797-2918.

10. On May 17, 2012, the victim called **KEELAN** at telephone number 540-797-2918. This call was monitored by law enforcement and recorded. During this conversation, **KEELAN** asked rhetorically: "Do I have to go, like, face charges and go to jail? . . . I would just go tell the truth." At times in the conversation, **KEELAN** blamed the victim for "stomping on my soul."

11. On May 24, 2012, the victim, who was still 17 years old at the time, again called **KEELAN** at telephone number 540-797-2918. This call was monitored by law enforcement and recorded. During this conversation, **KEELAN** said that he was not comfortable sending text messages or emailing the victim for fear of writing something that could potentially be used against him. **KEELAN** stated that it had been about two years since he and the victim had been together and added that he had destroyed the nude pictures he had taken of the victim. **KEELAN** told the victim that he wanted to drive to South Florida to engage in sexual activity with the victim. **KEELAN** added that he planned to leave, in his car from Virginia on June 15, 2012. Because the drive to South Florida would take 14 hours, **KEELAN** told the victim that he would be in South Florida by Saturday, June 16, 2012. He also told the victim that he would be bringing condoms and lubricant to facilitate his sexual activity with the victim. **KEELAN** also made the following statements during the monitored call:

   a. "You're ridiculously attractive, to me you're like perfect."

b. "You know, share my emotions. And you're a little funky pervy in bed...which, you know, I am too."

c. "I think your dick is absolutely gorgeous."

d. "I dream about your ass."

e. "Lube a finger and put it in your ass."

f. "I'm stroking myself, if that's what you are asking."

g. "I actually love the way you suck my dick. You're really good at it and you're really excited about it, and watching your head move on my cock is ridiculously exciting."

h. "I kissed your vocab kiss everyday."

i. "When you said you didn't feel that way anymore, I destroyed the pictures to try to be, to try to be responsible to you."

12. On June 1, 2012, the victim placed another call to **KEELAN**. Again, this call was monitored by law enforcement and recorded. During this conversation, **KEELAN** told the victim that he had made arrangements to stay at the Hollywood Gateway Inn on Polk Street in Hollywood, Florida. **KEELAN** gave the victim directions to the hotel. **KEELAN** reiterated his plan to leave Virginia on June 15, 2012 and to arrive in South Florida on June 16, 2012.

13. Throughout these phone conversations, **KEELAN** told the victim that he was concerned that he was being watched. **KEELAN** instructed the victim to maintain contact on a frequent basis through email, text message, and phone calls. He explained that only the victim's constant communications would assuage his concerns and provide him with the level of comfort he needed to pursue his secret relationship with the victim.

14. On June 1, 2012, law enforcement obtained reservation records from the Hollywood Gateway Inn, located at 2900 Polk Street, in Hollywood, Florida. The records revealed that, on

May 28, 2012, Thomas **KEELAN** had reserved a room at the hotel for seven days, beginning on Saturday, June 16, 2012. The reservation was made on the website www.hotels.com.

15. According to records obtained from the Virginia Department of Motor Vehicles, there is one vehicle registered to "**THOMAS PATRICK KEELAN**," and that is a 2001 bronze, 4-door Saturn sedan bearing Virginia license plate number XDN5285 ("**KEELAN**'s vehicle"). On June 13, 2012, law enforcement in Roanoke, Virginia conducted surveillance at the private high school where **KEELAN** teaches. **KEELAN**'s vehicle was parked in the parking lot of that school.

16. On June 16, 2012, law enforcement officers observed **KEELAN**, driving **KEELAN**'s vehicle, arrive at the Holiday Gateway Inn located at 2900 Polk Street in Hollywood, Florida 33020. **KEELAN** parked the vehicle in the hotel parking lot and entered the lobby. **KEELAN** checked into the hotel and was arrested in the lobby.

17. On June 16, 2012, **KEELAN** waived his *Miranda* rights and confessed that he had maintained a long-standing sexual relationship with the victim, which began when the victim was 15 years old. **KEELAN** said that he is in love with the victim and admitted that he had driven from Virginia to South Florida for the purpose of having sex with the victim. To that end, **KEELAN** told the agents that he had brought a bag of sex toys with him.

## CONCLUSION

18. Based upon the foregoing, there is probable cause to believe that **THOMAS PATRICK KEELAN**, using the mail or any facility or means of interstate commerce, did attempt to knowingly persuade, induce, entice, or coerce an individual who has not attained the age of 18 years to engage in sexual activity for which a person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2422(b); and did knowingly travel in interstate commerce for the purpose of engaging in illicit sexual conduct with another person, in violation of Title 18, United States Code, Section 2423(b).

Further your affiant sayeth naught.

_____
Special Agent Alexis Carpinteri
Federal Bureau of Investigation

Sworn and subscribed before me this 16th day of June, 2012.

_____
JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE