UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-mj-02867-GOODMAN

UNITED STATES OF AMERICA

v.

THOMAS PATRICK KEELAN,

Defendant.
_____/

## DETENTION ORDER

On June 21, 2012, a hearing was held pursuant to 18 U.S.C. § 3142(f) to determine whether the defendant, THOMAS PATRICK KEELAN, should be detained pending his criminal trial. Having considered the factors enumerated in 18 U.S.C. § 3142(g), this Court finds probable cause to believe that KEELAN committed violations of 18 U.S.C. §§ 2422(b) and 2423(b), which are offenses that generate a statutory rebuttable presumption that no combination of conditions will reasonably assure his appearance as required and the safety of the community. On the record presented at the hearing, KEELAN did not rebut this presumption.

In addition, in an abundance of caution, the Court also determined, by a preponderance of the evidence, that no condition or combination of conditions would reasonably assure KEELAN's continued appearance in this matter. Likewise, this Court also found, by clear and convincing evidence, that no condition or combination of conditions would assure the safety of any person or the community. Therefore, it is ordered that KEELAN be detained pending his criminal trial.

In accordance with the provisions of 18 U.S.C. § 3142(i)(1), this Court makes the following findings of fact and statement of reasons for the detention:

1. On June 16, 2012, KEELAN was charged, by criminal complaint, with attempting to knowingly persuade, induce, entice, or coerce an individual who has not attained the age of 18 years to engage in sexual activity, in violation of 18 U.S.C. § 2422(b); and knowingly traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with another person, in violation of 18 U.S.C. § 2423(b).

2. The charges stem from the following sequence of events: On May 9, 2012, a minor male victim ("the victim") provided law enforcement with the following information regarding his previous interactions with KEELAN:

   a. During the school year of 2009-2010, the victim was 15 years old and a student at a private school located in Miami Beach, Florida.

   b. KEELAN was one of the victim's teachers at the school.

   c. KEELAN initiated a friendship with the victim outside of the classroom.

   d. KEELAN sent text messages to the victim's cellphone. At first, the text messages contained mundane and everyday comments.

   e. At that time, the victim was a teenager who suffered from low self-esteem and depression. The victim often confided in KEELAN and was comforted by the friendship and support that KEELAN provided him. This was a vulnerable and difficult time for the victim, and KEELAN convinced the victim that KEELAN was the victim's only true friend and confidant. The victim believed that KEELAN cared deeply for him, and, in turn, the victim placed his trust in KEELAN.

   f. After KEELAN gained the trust and confidence of the victim, the tone of KEELAN's text messages began to change and would often contain flirtatious comments filled

with sexual innuendos. When KEELAN realized that the victim seemed comfortable with the tone of the text messages, he began sending text messages that directly addressed sexual activity between KEELAN and the victim.

      g. After some time, KEELAN sent a text message to the victim's cellphone and asked the victim if he wanted to "have sex" with KEELAN. At that time, the victim was 15 years old and was confused about his sexuality. KEELAN arranged to meet the victim and take the victim back to KEELAN's apartment, which, at the time, was located in North Miami, Florida. At KEELAN's apartment, KEELAN continued to talk to the victim about having sex, but he and the victim did not engage in any sexual activity.

      h. The next day, KEELAN again met with the victim and drove the victim back to KEELAN's apartment. This time, KEELAN kissed the victim and fondled the victim's penis. KEELAN then performed oral sex on the victim and had the victim perform oral sex on him. KEELAN instructed the victim not to disclose their relationship or sexual activity to anyone.

      i. In the next school year (2010-2011), the victim did not return to the private school in Miami Beach, Florida, but attended a public high school located in North Miami Beach, Florida. KEELAN continued to contact the victim, both via text messages sent from his cellphone and emails sent over the internet.

      j. Over that next year, KEELAN engaged in sexual activity (including oral sex and anal sex) with the victim approximately 60 times. Most of the time, KEELAN arranged to meet the victim near the victim's residence and drove the victim back to his apartment to engage in sexual activity.

k.   One time, however, KEELAN brought the victim to Oleta River State Park in North Miami, Florida, where KEELAN and the victim rented kayaks and paddled to a secluded island in that state park. On the secluded island, KEELAN engaged in sexual activity with the victim.

l.   On August 1, 2010, KEELAN rented a room at the Golden Glades Hotel in North Miami Beach, Florida. KEELAN then met the victim and brought the victim to the rented room. Inside the room, KEELAN engaged in sexual activity with the victim, who was still 15 years old.

m.   In the fall of 2010, KEELAN received a teaching position at a private high school in Roanoke, Virginia and relocated to Roanoke, Virginia. KEELAN is now the director of that school's English and Fine Arts Departments. KEELAN continued to contact the victim, both via text messages sent from his cellphone and emails sent over the internet.

n.   In December of 2010, KEELAN returned to South Florida and rented a room at the Holiday Gateway Inn in Hollywood, Florida. KEELAN again met with the victim and brought the victim back to the rented room. Inside the room, KEELAN engaged in sexual activity with the victim, who was, by then, 16 years old.

o.   On at least one occasion, KEELAN instructed the victim to pose in lewd and lascivious positions and then photographed the victim. During this photo shoot, KEELAN photographed the victim while the victim masturbated. On that day, KEELAN, using his laptop computer, signed into a child pornography website, and showed the victim child pornography images that depicted nude male children who were approximately the same age as the victim.

    p. In May of 2011, the victim's parents became aware of the victim's relationship with KEELAN. To protect the victim, the victim's parents placed the victim in the care of private educational institutions outside of the State of Florida.

  3. While the victim was away, the victim's parents gave law enforcement consent to utilize and control the email address the victim had used to communicate with KEELAN.

  4. Starting in August of 2011, law enforcement, using the victim's email account and pretending to be the victim, sent KEELAN several emails. KEELAN became suspicious of the emails and indicated that he knew the emails had not come from the victim because he knew the victim's "speech patterns." KEELAN added that he wanted to talk to the victim over the phone and to hear the victim's voice before he would be willing to communicate over email.

  5. In May of 2012, the victim, now 17 years old, returned to South Florida and agreed to cooperate with this investigation. On May 9, 2012, the victim, working with law enforcement, wrote KEELAN an email that, unlike the earlier emails law enforcement had sent, contained the "codes" he and KEELAN used to express their feelings and confirm their identities to one another. KEELAN replied to that email and agreed to talk to the victim over the phone.

  6. On May 10, 2012, KEELAN, using a cellphone, called the victim. This call was monitored by law enforcement and recorded. KEELAN questioned the victim about the earlier un-coded emails and demanded an explanation. The victim told KEELAN that he had sent those confusing emails because he was angry, confused, and had been drinking heavily. The victim apologized for the confusion. During the conversation, KEELAN, who told the victim that he was afraid that the victim might get him in trouble, stated: "What if [Victim] really wants me arrested to be better? Then I have to figure out, am I gonna face that or not face that." Towards

the end of the call, KEELAN and the victim agreed to maintain contact through cellphones and emails. KEELAN then gave the victim his cellphone number: 540-797-2918.

7. On May 17, 2012, the victim called KEELAN at telephone number 540-797-2918. This call was monitored by law enforcement and recorded. During this conversation, KEELAN asked rhetorically: "Do I have to go, like, face charges and go to jail? . . . I would just go tell the truth." At times in the conversation, KEELAN blamed the victim for "stomping on my soul."

8. On May 24, 2012, the victim, who was still 17 years old at the time, again called KEELAN at telephone number 540-797-2918. This call was monitored by law enforcement and recorded. During this conversation, KEELAN said that he was not comfortable sending text messages or emailing the victim for fear of writing something that could potentially be used against him. KEELAN stated that it had been about two years since he and the victim had been together and added that he had destroyed the nude pictures he had taken of the victim. KEELAN told the victim that he wanted to drive to South Florida to engage in sexual activity with the victim. KEELAN added that he planned to leave in his car from Virginia on June 15, 2012. Because the drive to South Florida would take 14 hours, KEELAN told the victim that he would be in South Florida by Saturday, June 16, 2012. He also told the victim that he would be bringing condoms and lubricant to facilitate his sexual activity with the victim.

9. On June 1, 2012, the victim placed another call to KEELAN. Again, this call was monitored by law enforcement and recorded. During this conversation, KEELAN told the victim that he had made arrangements to stay at the Hollywood Gateway Inn on Polk Street in

Hollywood, Florida. KEELAN gave the victim directions to the hotel. KEELAN reiterated his plan to leave Virginia on June 15, 2012 and to arrive in South Florida on June 16, 2012.

10. On June 1, 2012, law enforcement obtained reservation records from the Hollywood Gateway Inn, located at 2900 Polk Street, in Hollywood, Florida. The records revealed that, on May 28, 2012, KEELAN had reserved a room at the hotel for seven days, beginning on Saturday, June 16, 2012. The reservation was made on the website www.hotels.com.

11. On June 16, 2012, law enforcement officers observed KEELAN arrive at the Holiday Gateway Inn located at 2900 Polk Street in Hollywood, Florida 33020. KEELAN parked the vehicle in the hotel parking lot and entered the lobby. KEELAN checked into the hotel and was arrested in the lobby.

12. On June 16, 2012, KEELAN waived his *Miranda* rights and confessed that he had maintained a long-standing sexual relationship with the victim, which began when the victim was 15 years old. KEELAN said that he is in love with the victim and admitted that he had driven from Virginia to South Florida for the purpose of having sex with the victim. To that end, KEELAN told the agents that he had brought a bag of sex toys with him. KEELAN subsequently failed a polygraph examination on the question of whether he had engaged in sexual activity with other minors at other schools where KEELAN has taught.

13. Because of the nature of the violations with which the defendant is charged, 18 U.S.C. § 3142 creates a rebuttable presumption that KEELAN poses both a risk of flight and a danger to the community. This Court finds that, based on the foregoing facts, this presumption has not been rebutted.

14. In any event, based on the above findings of fact, supported by a preponderance of the evidence, this Court finds that KEELAN poses a risk of flight. Moreover, this Court finds, by clear and convincing evidence, that KEELAN, if released, would be a danger to the community.

15. Therefore, this Court specifically finds that there are no release conditions or combination of release conditions which would reasonably assure the safety of any other person and the community as required under 18 U.S.C. § 3142(e).

The Court hereby directs that:

    a. KEELAN be detained without bond;

    b. KEELAN be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

    c. KEELAN be afforded reasonable opportunity for private consultation with counsel; and

    d. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which KEELAN is confined shall deliver KEELAN to a United States Marshal for the purpose of an appearance in connection with court proceedings.

DONE AND ORDERED in Chambers, in Miami, Florida, this 26th day of June, 2012.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies to**: All Counsel of Record