UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 12-20496-CR-JEM

**UNITED STATES OF AMERICA**

vs.

**THOMAS PATRICK KEELAN,**

    **Defendant.**
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant, Thomas Patrick Keelan, faces a mandatory minimum penalty of ten years in prison and an advisory guideline range of 188 to 235 months in prison. Given the nature of the evidence in this case, and in light of the factors outlined in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court to impose a sentence at the high end of the guideline range–235 months.

### The 3553(a) Factors

**A.  Section 3553(a)(1): Nature and Circumstances of the Offense; and Section 3553(a)(2)(A): The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

The defendant's conduct in this case was extremely serious. The evidence at trial established that, as a 52-year-old English teacher, the defendant meticulously induced and enticed JS–his depressed and socially marginalized 15-year-old student–into a sexual relationship. As that relationship progressed, the defendant became the first person to engage in oral, anal, and sado-masochistic sex with JS–who was at the time so confused about his identity that he had taken to cutting himself with sharp objects. All told, the defendant had anal and oral sex with JS between 50-60 times–all while JS' family thought JS was either at school, with a friend, or at tennis practice.

During sex, the defendant routinely bound JS with ropes and ties; whipped JS; slapped JS; and penetrated JS with a whole host of sexual objects, including "dildos," "vibrators," and "butt plugs."

None of this was accidental. As the evidence at trial showed, the defendant meticulously groomed JS into this sexual relationship. As JS testified: it was the defendant who first approached JS about JS' self-mutilation and who gave JS his phone number; it was the defendant who began reaching out to JS outside of school; it was the defendant who first discussed sex with JS; it was the defendant who reserved and paid for the hotel rooms where he and JS would have sex; it was the defendant who picked JS up before, and dropped JS off after, each and every sex date; it was the defendant who took JS to Oleta River State Park and who led JS to his "secluded island," where he and JS had sex several times; it was the defendant who taught JS the various sexual positions in which they engaged; it was the defendant who introduced sex toys into the relationship; it was the defendant who introduced JS to pornography; and, it goes without saying, it was the defendant who taught JS to engage in sado-masochistic sex.

Perhaps no less disconcerting, the defendant's obsession with JS continued even after JS tried to end the sexual relationship. Between 2011 and 2012, the defendant, without consulting JS, *twice* made the 14-hour drive from Virginia to South Florida in the hopes of finding JS. Although he was unsuccessful both times, the defendant circled JS' block and, on one occasion, called JS' home in search of JS.

In light of the defendant's infatuation with JS, it was no surprise that, when JS reinitiated contact with the defendant in May of 2012, the defendant enthusiastically made that 14-hour drive again. In anticipation of this meeting, the defendant filled his trunk with condoms, lubricants, ties and various other restraints, 30 bottles of amyl nitrate (which, JS testified, the defendant would sniff

before anal sex), a box of latex gloves (which, JS explained, the defendant would don while digitally penetrating JS), "vibrators," "dildos," "butt plugs," a whip, a wand, a feather, and other assorted accouterments of sado-masochism.

JS–who had never engaged in sexual intercourse before his relationship with the defendant–has never been the same since. After ending his relationship with the defendant, JS had sex with many other men, most of them complete strangers he met on the Internet–conduct, he insists, he would never have engaged in before his relationship with the defendant. He spent a full year at wilderness camp and boarding school, hoping to distance himself from the defendant. And he has been to countless psychologists, psychiatrists, and therapists in an effort to move past the emotional and psychological damage the defendant's manipulation has caused him.

A sentence at the low end–or the middle–of the guideline range simply does not account for the nature and scope of the defendant's conduct in this case. After all, the defendant's guideline range would be the same if he had only had sex with JS one time. But he did not have sex with JS only one time; he had sex with him 50 or 60 times. Similarly, the defendant's guideline range would be the same if he had only had sex with JS when JS was 17. But, again, the defendant began having sex with JS when JS was 15. Likewise, the defendant's guideline range would be the same if he were only a few years older than JS. But the defendant was in his fifties when he initiated a sexual relationship with JS, who was then 15. Lastly, the defendant's guideline range would be the same if he had "only" had oral sex with JS. But he did not simply engage in oral sex with JS; he engaged in oral, anal, and various stages of sado-masochistic sex with JS–much of which involved binding JS, whipping him, slapping him, and penetrating him with a whole litany of assorted sexual instruments.

Because a sentence at the low end–or middle– of the guideline range would fail to distinguish the defendant's conduct from far less culpable violators of 18 U.S.C. § 2422(b), the United States requests that the Court sentence the defendant to 235 months in prison.

**B.     Section 3553(a)(1): History and Characteristics of the Defendant**

The defendant's history and characteristics likewise merit a sentence at the high end of the guideline range. To begin with, the evidence at trial proved that the defendant maintains an unhealthy infatuation with young-ish looking boys. In his post-arrest interview, the defendant several times admitted that he is sexually attracted to young Latino men, and went so far as to say that he sometimes sees young boys walking along the street and thinks to himself: "He's hot. I hope I meet him in 5 years." This sentiment was corroborated by the defendant's pornography collection, which consisted entirely of DVDs depicting young-looking boys engaged in sexual intercourse.

Even the defendant's own trial expert, Dr. Michael Ditomasso, after completing a psychological evaluation of the defendant, recommended that: "If or when Thomas is returned to the community, there are two safety factors that is [sic] suggested could be put into place. One would be a stay-away order prohibiting Thomas from contact with minors and the other would be that he engages [sic] in a sexual offender treatment program." Dr. Ditomasso's Report, at 7. To be sure, Dr. Ditomasso (whom the defense did not trust enough to call at trial) concluded that "[i]n terms of dangerousness, the low risk [of recidivism] finding is appropriate"; but he added "some caveats." *Id*. For example, Dr. Ditomasso writes: "Certainly do [sic] not want to put Thomas back into a position of mentoring teenagers." *Id*. Again, these were the conclusions of a psychologist who was being paid by the defense.

4

We should stress, also, that the defendant's antisocial fascinations are not ideational only, and, in that respect, they are certainly not harmless: it was the defendant's infatuation with young boys, after all, that led him to prey on JS, whom the defendant repeatedly said was "ridiculously attractive to" him.

Because the defendant has never been convicted of a crime, his criminal history category (and, as a result, his advisory guideline range) does not adequately take into consideration these aggravating aspects of his history and his personality–aspects that, when taken together, paint a grim picture of the his future prospects in our society.

**C.     Section 3553(a)(2)(B): The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct; and 3553(a)(2)(C): The Need for the Sentence Imposed to Protect the Public From Any Future Crimes of the Defendant**

*1.     General Deterrence*

The media has followed this case very closely since the defendant was first arrested in June of 2012. Since that time, in his emails and phone calls to friends and family from FDC, the defendant has repeatedly minimized the severity of his criminal conduct and blamed the Government and JS' family for this prosecution. The defendant, it seems, is also in the process of writing a tell-all book, which, he hopes, will exonerate him in the public eye.

The Court should impose a sentence that, in the strongest terms, condemns the defendant's egregious criminal conduct and sends a message to society that the defendant's predatory and harmful behavior is not, and will not be, tolerated.

*2.     Specific Deterrence*

As I mentioned above, the defendant seems to have a very powerful affinity for young boys.

5

He also appears not to recognize how harmful his conduct has been. Most concerning, he does not seem to understand why or how his conduct was wrong or illegal. As an example, in a recent email he sent to a friend from FDC, the defendant mused that, had he committed his crimes in Saudi Arabia, he would have been executed; had he committed them in Europe, he mocked, he would not have been arrested. Given this incongruence, he asked rhetorically whether the United States more closely resembles Europe or Saudi Arabia.

Because the defendant does not seem interested in, or capable of, rehabilitation–to the contrary, he seems to flaunt his relationship with JS and denies that there was ever anything wrong with it–only a severe prison sentence will protect the community from his future criminal acts.

## Conclusion

For the foregoing reasons, and in light of the factors outlined in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court sentence the defendant to a term of 235 months in prison.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:   s/ Roy K. Altman
Roy K. Altman, AUSA
Court ID No. A5501271
Assistant United States Attorney
99 Northeast 4th Street
Miami, Florida   33132
Telephone: (305) 961-9435
Facsimile: (305) 536-4676
Roy.Altman@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ Roy K. Altman
Roy K. Altman
Assistant United States Attorney
