```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                     CASE NO.  12-20496-CR-JEM
 3

 4

 5    UNITED STATES OF AMERICA,

 6                   Plaintiff,

 7         vs.

 8                                      Miami, Florida
                                        April 11, 2013
 9    THOMAS PATRICK KEELAN,

10                   Defendant.
      _____
11              TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE JOSE E. MARTINEZ
12                 UNITED STATES DISTRICT JUDGE

13
      APPEARANCES:
14
      FOR THE PLAINTIFF:
15                        United States Attorney's Office
                          BY:  ROY ALTMAN,  A.U.S.A.
16                        BY:  VANESSA JOHANNES, A.U.S.A.
                          99 N.E. 4th Street
17                        Miami,  Florida 33132

18
      FOR THE DEFENDANT:
19                        BY:  SAMUEL RANDALL, A.F.P.D.
                          BY:  ABIGAIL BECKER, A.F.P.D.
20                        150 West Flagler Street
                          Suite 1700
21                        Miami, Florida 33130

22    REPORTED BY:        DAWN M. WHITMARSH, RPR
                          Official Court Reporter
23                        400 N. Miami Avenue, 10S03
                          Miami, Florida  33128
24                        Telephone:  305-523-5598

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1                    P-R-O-C-E-E-D-I-N-G-S

2           COURTROOM DEPUTY:  Case number

3    12-20496-criminal-Martinez, United States of America versus

4    Thomas Patrick Keelan.

5           Counsel, please state your appearance.

6           MR. ALTMAN:  Good afternoon, Your Honor.  Roy Altman,

7    Vanessa Johannes and Special Agent Alexis Carpenteri on behalf

8    of the United States.

9           THE COURT:  Good afternoon.

10          MR. RANDALL:  Good afternoon, Your Honor.  Samuel

11   Randall and Abigail Becker on behalf of Thomas Keelan who is

12   present.

13          THE COURT:  Good afternoon.

14          All right.  We're here on the sentencing on Mr. Keelan.

15   I have reviewed the verdict form, the presentence investigation.

16   Note that the defendant has requested that any term of

17   incarceration be served at FCI McKean or in the alternative, at

18   FCI Otisville.  I'll be happy to make that recommendation.

19          I've also reviewed the addendum to the PSI, the second

20   addendum, the defendant's objections, the Government's response,

21   the Government's sentencing memorandum, letters on behalf of --

22   an initial letter on behalf of the defendant then additional

23   letters filed a couple of days ago, then I think one filed this

24   morning, and the defendant's omnibus response to the

25   Government's sentencing pleadings.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          I think I'm ready to proceed at this time unless you're

2     prepared to file more stuff now, but I'm ready to proceed at

3     this time, so let me hear first from the Government.

4          I've got your memo that says you want the maximum, the

5     upper end of the guideline range.  I'm not really inclined to do

6     that Mr. Altman, but I'm willing to listen to you as to why.

7          MR. ALTMAN:  Your Honor, did you want me to address the

8     objections to the PSI first?

9          THE COURT:  Well, why don't you wait until they make

10     them then we can do that.  I just wanted to hear your -- well

11     I'll tell you what, maybe it would be better to start this way.

12     Mr. Randall, if you will tell me if there are any objections

13     that you have filed that have not been responded to to your

14     satisfaction either by the Government or by the probation

15     office, so tell me what is still outstanding.

16          But first let me get an appearance from Probation.

17          THE PROBATION OFFICER:  Good afternoon, Your Honor.

18     Shannon Culberson on behalf of Probation Department.

19          THE COURT:  Good afternoon, Ms. Culberson.  All right.

20     Go ahead.

21          MR. RANDALL:  With respect to the factual objections, I

22     think Your Honor can rule on those, Your Honor heard the trial.

23          THE COURT:  Tell me what they are so I can rule on

24     them.

25          MR. RANDALL:  Mr. Keelan denied sending flirtatious and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   sexually charged text messages to J.S., that's the first

2   objection.

3          THE COURT:  Okay.  Are you objecting to the

4   characterization of them as flirtatious and sexually charged or

5   to the fact that it happened?

6          MR. RANDALL:  We agree there were text messages between

7   them, but we deny they were sexually charged and flirtatious.

8          THE COURT:  All right.  Mr. Altman?

9          MR. ALTMAN:  Well, Your Honor, as the testimony of J.S.

10  clearly demonstrated, the text messages did contain sexual

11  innuendo for some time.  Ultimately as J.S. testified at trial,

12  they became more overtly sexual over time and they did include

13  flirtation and they were sexually charged.  So we would ask the

14  court overrule that first objection.

15         THE COURT:  All right.  I will overrule that objection.

16  I think they can be fairly characterized and flirtatious and

17  sexually charged.

18         Go ahead.

19         MR. RANDALL:  The second is that Mr. Keelan denies that

20  he asked -- that he ever asked J.S. to have sex.  That he was

21  the one that initiated that conversation, and I think the

22  evidence at trial demonstrated that Mr. Keelan had to --

23  attempted to persuade J.S. that the sexual relationship was a

24  bad idea and that it was J.S. who persuaded Mr. Keelan into

25  having a sexual relationship when it came to the two actually

1    having sex.

2         THE COURT:  You know, I'm not sure who started it and

3    who ended it, but I think that the jury heard this and I think

4    that they're the ones that pretty much made a decision that it

5    was that.  But let me hear from Mr. Altman.

6         MR. ALTMAN:  Your Honor, I would say first of all that

7    J.S. specifically testified both on direct and on redirect that

8    Mr. Keelan had sent him a text message asking him, point blank,

9    do you want to have sex, after many text messages that were

10   initially innuendo then increasingly more flirtatious over time.

11        In addition to that, obviously J.S. testified that on

12   cross-examination that Mr. Keelan and J.S. did have some sort of

13   playful back and forth where Mr. Keelan told him that it was

14   more than just sex, and J.S. said that he wanted the sex but

15   J.S. at all times was clear that that first text message about

16   sex came from Mr. Keelan.

17        In any event Your Honor, I think that the evidence as

18   it came out at trial indicated that irrespective of what

19   happened that very first time, the reality is as J.S. testified

20   over the course of the relationship, which lasted about a year,

21   Mr. Keelan and J.S. had sex many, many times.  Sometimes

22   multiple times a week for many, many, months in a row.  And so

23   as J.S. testified, sometimes it would have been, during the

24   course of that relationship, J.S. who initiated and asked for

25   the sex with Mr. Keelan during the relationship and sometimes it

1  would have been Mr. Keelan who asked for and initiated the sex

2  with J.S.

3      And the fact of the matter is that I think under those

4  circumstances, the PSI correctly outlines the facts.

5      THE COURT:  I'll overrule your objection.  I remember

6  it pretty clearly.  Go ahead.

7      MR. RANDALL:  Number three, that Mr. Keelan denies that

8  he ever instructed J.S. not to disclose their sexual

9  relationship.

10     MR. ALTMAN:  And again, the testimony was clear as to

11 this fact.  J.S. repeatedly testified that Mr. Keelan talked to

12 him quite a bit about the consequences of him disclosing the

13 nature of their relationship, about how that would result in his

14 incarceration and how ultimately that would result in a great

15 shame, embarrassment and guilt on J.S.'s head.  And in fact,

16 many of the e-mails that were put into evidence during the

17 course of the trial really corroborated that testimony.  If the

18 court will remember, many of those e-mails and some of the

19 recorded phone calls, all -- many of them Mr. Keelan repeatedly

20 sent to J.S., you know, if you had told people about this I

21 would have gone to jail.  And this would have -- the shame and

22 the guilt would have killed you.  You know you shouldn't do

23 that, that kind of thing.

24     And so I don't know if the word instructed is what

25 Mr. Randall is talking about, but certainly as Dr. Patterson

1    testified during her expert testimony at trial, that kind of

2    guilt trip that Mr. Keelan repeatedly administered on J.S.'s

3    consciousness over the course of several years and during the

4    course of the investigation is a very common form of

5    manipulation that's used in the final phase of the grooming

6    process.  So we would ask that the court overrule that

7    objection.

8            THE COURT:  I will overrule that objection.

9            Go ahead, Mr. Randall.

10           MR. RANDALL:  I think number four has been resolved.  I

11   think the Government agreed that paragraph 13 should be

12   supplemented to indicate that 2010 was the last time Mr. Keelan

13   ever saw J.S. in person and that in December 2010, J.S. broke

14   off their sexual relationship.

15           MR. ALTMAN:  And Your Honor, I agree that is factually

16   accurate.  What I noted in my response was only that if the

17   court were to have probation change that aspect or add that into

18   the PSI.

19           I would also ask that the following sentences be added

20   and I'll quote, "after J.S. told the defendant that he wanted to

21   end their sexual defendant, the defendant, without consulting

22   with J.S., twice drove down from Virginia to South Florida in

23   the hopes of finding and meeting J.S.  On both trips, the

24   defendant drove around J.S.'s block in search of J.S., and on

25   one occasion he called J.S.'s home but hung up when J.S.'s

1   mother answered the call", end quote.  And that is directly from

2   a recorded conversation, several recorded conversations

3   Mr. Keelan had with J.S. during the course of our law

4   enforcement investigation.

5         THE COURT:  What does that add to the PSI?  How does

6   that help or hurt the cause of trying to come up with a fair

7   sentence?  I don't see how that really -- you know, all you

8   really know is that that's what he said.  You don't really know

9   that he drove down from anywhere.

10         MR. ALTMAN:  I agree, Judge.  I think the PSI is fine

11  as is.  My only point is if the court was going to add to the

12  PSI the fact that the relationship ended in 2010, that I would

13  want the PSI to be clear for the record that despite the fact

14  that it ended, Mr. Keelan continued to pursue J.S. against

15  J.S.'s wishes.

16         THE COURT:  No, I will add the -- you'll add the

17  initial thing that it ended in 2010.  I won't add the other

18  stuff because I don't see that helps at all.  All right.  Go

19  ahead.

20         MR. RANDALL:  Number five, I think the Government is in

21  agreement with this as well, that --

22         THE COURT:  Well, they weren't in an awful lot of

23  agreement with the last one, but see if you can do better this

24  time.

25         MR. RANDALL:  That he never showed child pornography to

1   J.S.

2          THE COURT:  That's correct.

3          MR. ALTMAN:  That's correct, Your Honor.

4          THE COURT:  That will be fixed in the PSI.

5          MR. RANDALL:  The last two I also believe the

6   Government is in agreement with the second page of the PSI says

7   he was convicted of coercion.  Obviously that was not submitted

8   to the jury.

9          THE COURT:  Right.  That was not an issue of the jury,

10  so how do we want to fix that?

11         MR. RANDALL:  There are four elements of the statute,

12  three of which were submitted to the jury.  So we can say

13  enticement, inducement.

14         THE COURT:  Can we fix that?

15         THE PROBATION OFFICER:  Yes, Your Honor.  That will be

16  fixed.

17         THE COURT:  That will be fixed.  What else?

18         MR. RANDALL:  Lastly we object to the condition that he

19  not possess adult pornography when he's released from prison.

20         THE COURT:  I'm not going to go along with that.  I

21  don't see any justification for doing that when you have a

22  situation.  I don't know what makes Mr. Keelan click or work or

23  do, whatever it is he's going to do, I don't know.  But if the

24  possibility exists that viewing adult pornography might trigger

25  something, you know, I mean I don't think people have a

1  God-given right to view any kind of pornography if they have

2  been convicted of a crime of this nature.  So I don't think it's

3  an unreasonable restriction on him during his supervised

4  release.  So I'll deny your motion on that.

5      MR. RANDALL:  Okay.

6      THE COURT:  I'm not an expert.  I assume they have

7  experts that deal with that sort of thing, and if they don't

8  think that he should have it, that's fine with me.

9      MR. RANDALL:  Okay.  I'll rest on the pleadings with

10  respect to two of the three PSI objections.  The one that I

11  really think needs to be addressed still because the Government

12  still opposes it is the use of the computer.  There was no use

13  of a computer in this offense.  There were e-mails between them

14  after the sex ended that the Government did not want to

15  introduce into evidence.  The e-mails were completely innocuous.

16  So I don't think there's any basis to say that there was a

17  computer used in furtherance of this offense at any point.

18      THE COURT:  But there were e-mails that facilitated the

19  transaction.  I mean, there were e-mails that talked about, by

20  my recollection, about meeting, in and of themselves the e-mails

21  were not indecent or improper, but I don't think they have to be

22  in order for them to be used.

23      Mr. Altman, let me hear from you.

24      MR. ALTMAN:  That's correct, Your Honor.  I think what

25  Mr. Randall is referring to, and just to clarify the record,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Mr. Randall is referring to the e-mails that were introduced at

2    trial which are e-mails --

3              THE COURT:  By them.

4              MR. ALTMAN:  Actually it was by me, but they were

5    introduced at trial and those were e-mails that were exchanged

6    between Mr. Keelan and J.S. after their relationship had ended.

7    In other words, during the course of the investigation.  But

8    J.S. again, and this is the point, the same point the court has

9    already ruled on with respect to the text messages.  Yes, we

10   don't have the e-mails from 2009 and 2010 when J.S. and

11   Mr. Keelan initiated their relationship.  The reality is though

12   that J.S. testified under oath at the trial and he specifically

13   testified, as the court has just recalled, that Mr. Keelan and

14   he exchanged many e-mails over the course of their relationship,

15   e-mails that caused him to fall in love with the defendant.

16   E-mails about meeting places.  E-mails about their relationship.

17   E-mails about their friendship.  And all of this, of course, led

18   our doctor, Dr. Patterson, to conclude that all of this was part

19   and parcel of the grooming process, making J.S. feel

20   comfortable, making him to feel in love with this defendant and

21   it's very common in fact.  So yes, although I don't think there

22   was any testimony that any of the e-mails were overtly

23   salacious, the reality is they didn't need to be.  They were

24   part and parcel of the grooming process and for that reason,

25   they were part of the influence that the defendant exerted on

1   J.S.

2          THE COURT:  See, I was inclined to look at this one

3   much more deeply than the others because I can understand your

4   argument, but do see how you can get away from the fact that he

5   actually did use a computer?  Although the contents may not have

6   been overtly sexual and salacious, I think that clearly they

7   were part and parcel of the entire thing, so I will deny your

8   motion on that.

9          MR. RANDALL:  Okay.

10          THE COURT:  Or overrule your objection, I always get

11   mixed up as to which.  Whichever it is I did.

12          MR. RANDALL:  I'd rest on the pleadings as well with

13   respect to my argument that the statutory penalties are

14   unconstitutional.

15          THE COURT:  All right.  I will overrule you on that.

16   Just bring it up so I can rule though.  Because if there are any

17   that you have not gotten, I guess I could just say anything that

18   you don't bring up I'm overruling you on or denying.  Either

19   way.

20          MR. RANDALL:  And we also object, I'll just raise it

21   here, that the use of the 2G1.3 enhancement as opposed to the

22   statutory rape guideline under 283.2.

23          THE COURT:  Yeah, I'll overrule your objection on that.

24   All right?

25          Ready to go then?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. RANDALL:  Yes.

2          THE COURT:  All right.  Let me hear from Mr. Altman as

3    to what you believe is a proper sentence, although I have read

4    your response.

5          MR. ALTMAN:  Your Honor, and I don't want to belabor

6    the point because I know the court has read my papers.

7          My point in the papers was that, as I think we've all

8    agreed now -- well, we may not have agreed, but I think the

9    court has found that the guideline range is 188 to 235 months.

10   With a mandatory minimum --

11         THE COURT:  I think that what we agree on is that based

12   upon my rulings the applicable guideline range is 188 to 235; is

13   that correct, Mr. Randall?

14         MR. RANDALL:  Yes, Judge.

15         THE COURT:  Okay.

16         MR. ALTMAN:  Right.  And with a mandatory minimum of

17   ten years for each of the two counts.  And I'm not asking that

18   the mandatory minimums be stacked or run consecutively which

19   would result in a sentence of 240 months, what I'm asking for is

20   the high end of the guideline range which is 235 months.

21         And the reason why I think that's a reasonable, fair

22   and sufficient sentence, Your Honor, is because first of all,

23   looking at the factors under 3553 and starting with the nature

24   and circumstances of this offense, I think in a word, this

25   offense was serious.  In fact, I think it was very serious.  I

1    think that what you see typically in cases that are brought
2    under this statute is you typically see a situation where a
3    person is in another state and he is communicating via chat or
4    e-mail with an undercover agent who talks to the person
5    pretending to be a child.  The person travels down to Miami in
6    order to have sex with what he believes to be a child and is
7    arrested at a bus stop or a motel or a restaurant by the law
8    enforcement agencies who have been running this sting operation.
9    Under those circumstances, you have someone who has never
10   engaged in predatory sex, at least that can be proven with an
11   underage victim, someone who the defense attorneys often say it
12   was just playing out a fantasy, role playing over the internet
13   and wasn't intending to do any real harm.  That sentencing range
14   that we have now, 188 to 235, applies equally to that person as
15   it does to Mr. Keelan's case.

16       Mr. Keelan's case, I think, can be distinguished in
17   many, many important respects.  First of all, of course
18   Mr. Keelan didn't just attempt to have sex with someone, he
19   actually had sex with J.S. who was his 15-year-old student at
20   the time that was in his care, custody and control. J.S. was
21   somebody who trusted him, who believed in him, who looked up to
22   him, who respected him and Mr. Keelan abused that respect, that
23   admiration to placate his own sexual desires, his own sexual
24   satisfaction.  And he did it not just one time, but repeatedly
25   multiple times a week, week after week for over a whole year.

1    And the reality is, Judge, that for the vast majority

2    of the time, Mr. Keelan was having J.S. leave school or leave

3    tennis practice or leave his friends and having sex with him at

4    parks and in rather seedy motel rooms in Hollywood, Florida

5    while his family thought that he was in school or in tennis

6    practice and with a friend.

7    Really, in my opinion, predatory conduct, Your Honor,

8    that lasted many, many months.  It was all premeditated, it was

9    all intentional and it was done all of Mr. Keelan's free will as

10   I said to placate his own sexual satisfaction.

11   Secondly I would say, Your Honor, that the relationship

12   progressed in the severity of the sexual conduct over time.

13   It's not like -- I don't mean to minimize a one-time sexual

14   incident, but it's not like Mr. Keelan and J.S. had sex one time

15   and it was normal sex and that was the end of it.  Mr. Keelan

16   ultimately ended up introducing sadomasochistic sex into the

17   relationship.  As J.S. testified both on direct and redirect

18   examination, Mr. Keelan introduced a whole host of sexual

19   objects; straps and ties and ropes, he slapped J.S., he whipped

20   J.S.  He penetrated J.S. with a whole host of different

21   objects, vibrators and such and he would hit J.S. during sex.

22   In other words, it's a much more severe course of sexual conduct

23   than anything that we typically see in these cases.

24   More importantly, Judge, after J.S. broke off the

25   relationship with the defendant, the defendant was still so

1    obsessed and infatuated with J.S. that the defendant actually

2    against J.S.'s wishes traveled down to Miami on two separate

3    occasions to meet with J.S.  He circled around J.S.'s block, he

4    called J.S.'s home.  He was prowling for J.S. in a very real

5    way.  While J.S., unbeknownst to him, was away at reform school

6    because of frankly how much damage the defendant's conduct had

7    on J.S.'s future conduct, which we'll get to in a moment.

8    Obviously J.S. wasn't here, the defendant never had an

9    opportunity to meet with J.S.

10        But in deciding who was the initiator, who was the

11   aggressor, who was responsible for all of this, I think those

12   two trips each, 14 hour drives one way and then 14 hours back

13   from Virginia, I think are emblematic of the intentions.  As

14   J.S. testified in a moment of some levity during the trial after

15   Mr. Randall asked whether or not Mr. Keelan was coming down just

16   to say hello, J.S. made clear that Mr. Keelan and J.S. never

17   hung out just to say hello.  That every single time that

18   Mr. Keelan picked J.S. up and took J.S. to one of those hotel

19   rooms or to that secluded island of his in Oleta, each and every

20   time he was having sex with J.S., he was tying J.S., whipping

21   J.S. and sometimes slapping J.S. during sex.  I think that's

22   also emblematic of the defendant's intentions.

23        More importantly, Judge, I think later on, when J.S.

24   starts cooperating with law enforcement and law enforcement and

25   J.S. together contact the defendant after years of J.S. being --

1  a year, a year and a half I think of J.S. being away, the

2  defendant doesn't resist the opportunity, he doesn't say well,

3  it was just a mistake, I made a mistake, it was an accident, I

4  want to move on with my life, the defendant jumped at the

5  opportunity.  He reserved a hotel room down in South Florida. He

6  packed all of these sex toys and bottles of amyl nitrate and

7  latex gloves which J.S. testified that the defendant would don

8  during digital penetration.  He packed condoms and lubricant and

9  a whip, all things J.S. testified the defendant would use during

10  sadomasochistic sex with J.S. during the course of their

11  relationship.  He packed them all into a bag and he drove down

12  to South Florida.  And a long the way, he stopped at a sex shop

13  in Fort Pierce in order to buy additional sex toys which he, of

14  course, brought with him to the hotel room where he planned to

15  text J.S. to have J.S. meet him a year and a half after J.S.

16  told him the relationship was over.

17      Your Honor, the defendant never learned his lesson and

18  I think this last part, the part about his continuing course of

19  conduct even after J.S. broke off the relationship, brings me to

20  the second factor under 3553, which is the history and

21  characteristics of the defendant.  Now, obviously the defendant

22  has no criminal history.  That fact is already factored into his

23  guideline range.  What I would say though that his guidelines do

24  not take account of is these very, very dangerous aspects of his

25  personality that I think came into play despite the fact that

1   the defendant is a very intelligent man, by his own ready

2   admission many times during his taped statement, the defendant

3   repeatedly came down to South Florida prowling after J.S., came

4   down to South Florida after J.S. called him because the

5   defendant had not learned his lesson.  Because if the

6   defendant's calls and e-mails from the Federal Detention Center

7   are any indication, the defendant still has not learned his

8   lesson.

9            Because the reality, Judge, if you step back is that

10  the defendant does not understand that he did wrong in this

11  case.  The defendant continues to believe, as all of those

12  letters that he had people write on his behalf suggest, that

13  this is a homophobic campaign by homophobic prosecutors and

14  judges out to get gay people and put gay people in prison, which

15  of course is preposterous.  The defendant always, from the very

16  beginning, projected all of his evil conduct onto J.S.  He was,

17  as Dr. Patterson said, the prototypical sexual predator who,

18  when he's first approached by law enforcement, says it wasn't my

19  fault that I had sex with that minor, the minor jumped on my lap

20  and the minor looked at me in this smiling way and really wanted

21  me to have sex with him.  I had sex with him in order to save

22  that child.  Dr. Patterson testified that is a very common

23  reaction from sexual predators and it's precisely the reaction

24  that Mr. Keelan had when he was approached by law enforcement.

25            And I think the most disconcerting part is that it

1   continues to be his reaction from the Federal Detention Center.

2   All of his e-mails, Judge, all of his phone calls, all of the

3   letters that were written on his behalf by people who were never

4   at the trial, have never met J.S., have never known anything

5   about the case accept for what Mr. Keelan told them in

6   self-serving statements, are indicative of someone who is

7   completely unrepentant for his conduct.  Somebody who completely

8   fails to understand why his conduct was so harmful and so

9   dangerous and why his continuous course of conduct is so

10  antisocial and why it's wrong.

11          This is not just a course of statutory rape, it's not a

12  case of statutory rape, it's a case of somebody who manipulated

13  and meticulously groomed a small child, a child who was

14  confused, who was depressed, who was socially marginalized and

15  used all of those negative aspects of that child's personality

16  in order to placate his own sexual satisfaction in a way that

17  is, in some ways, much more dangerous from the regular monster

18  on the street who grabs the child from his parents and rapes

19  them in the basement.  Because this is the kind of person that

20  parents don't see coming.  This is the kind of person that

21  principals and teachers don't see coming.  Because the defendant

22  makes himself out to be the nice guy who is out to save the

23  world, change the children in his class when in reality, he's

24  taking one of those children and he's really ruining his life.

25          And what I would say about that is one of the factors

1   under 3553 obviously is that the sentence needs to take into

2   consideration the retribution for the victims.  And the reality,

3   Judge, in this case is that sadly, J.S. will never be the same

4   again.  J.S. was a confused 15-year-old Orthodox Jewish boy.  As

5   the court will remember he had been adopted from Paraguay, he

6   was confused about whether he was Latino or whether he was

7   Jewish.  He was confused about whether he was gay or not.  He

8   was confused about whether his family would accept him given his

9   own sexual orientation and his own feelings of miss-identity.

10  He was a kid who was so confused that he started to slice

11  himself with sharp objects.  And Your Honor, the reality is that

12  J.S. had never had sex or any sexual relationship with anyone

13  before the defendant opened this Pandora's box of sexual

14  misconduct that really resulted in J.S. actually having sex with

15  other children -- sorry, other grown men that he had met on the

16  internet.  That resulted in J.S. being sent away to

17  psychiatrists and psychologists and therapists in order to

18  distance himself from the defendant, in order to overcome the

19  emotional and psychological harm that the defendant caused to

20  J.S.

21         In many of the studies, Your Honor, that have been done

22  on child sex victims are emblematic, i think, of much of the

23  behavior we see from J.S.  Re-playing of their sexual abuse.

24  Reaching out to older people to engage in sexual conduct with

25  people who are clearly not their age.  This is very common in

1    these cases, Your Honor.  And it's no less common and it's

2    ever-present in this case.  It may always be present, Your

3    Honor.  I haven't seen J.S. in the last couple of months and my

4    understanding is he's doing a lot better, but the reality is

5    that it was the defendant's conduct that resulted in J.S.'s

6    being sent away to these schools in order to be kept away from

7    himself, really.  And so that's the third factor I wanted to

8    point out.

9        The fourth and final factor, Your Honor, is deterrence.

10   Your Honor, even the defense's own psychologist, Dr. Michael

11   DiTommaso, who the defendant paid before the trial, whom the

12   defense did not call because they didn't like what he said

13   during the Daubert hearing, even he restricted or in his report

14   recommended that the defendant's contact with teenagers and

15   children and students be restricted after he's let out of prison

16   because even he was uncomfortable with the defendant being

17   around small children and teenagers and whatever else.

18       And there's good reason for that, Your Honor.  The

19   defendant's pornography collection clearly indicated that the

20   defendant was very sexually interested in young-ish looking

21   adolescent males.  His own statements in his post-arrest

22   confession clearly indicated that he has a sexual infatuation

23   with teenaged boys.  That he sees teenaged boys on the street

24   and he says he's ridiculously hot he said.  I hope I meet him

25   again in five years.  That he said when he first met J.S. when

1   he was 15, he was quote, ridiculously attractive to me, end

2   quote.  It's clear that the defendant has a sexual infatuation

3   with young-ish looking adolescent boys.

4           It's also clear, Your Honor, that the defendant doesn't

5   see anything wrong with that.  As I quoted in my papers, the

6   defendant actually, I think, sent an e-mail to a friend from FDC

7   and he said something to the effect of if this had happened in

8   Saudi Arabia, I would have been beheaded.  If it would have

9   happened in Europe, I would still be free.  And he says in the

10  United States, I'm going to jail for life or something like

11  that, which I'll leave it to you to decide which society we're

12  closer to.

13          In other words, suggesting that this whole prosecution,

14  this whole situation is a complete sham that he misunderstands

15  the whole purpose of this process.  That he misunderstands why

16  he's here, that he continues to blame J.S. for all of his

17  conduct and that he continues to blame us, I guess, and the

18  Government at large for prosecuting someone just by virtue of

19  the fact that he's homosexual, none of which, of course, is

20  based in any reality except his own.

21          And so the fact that the defendant has this

22  predilection, a predilection that I'm not sure can ever be

23  dissipated, a predilection that's coupled with his unrepentant

24  behavior, a behavior that is not warranted -- for which a low

25  end of the guideline range is not warranted. Low end of the

1   guideline range is for people who plead guilty, who accept

2   responsibility, who have learned from their mistakes, who are

3   ready to turn their lives around, who are ready to be

4   rehabilitated.

5        The defendant is the farthest thing from that.  He's

6   unrepentant.  He still has that same predilection for young-ish

7   looking adolescent boys.  And he continues to believe that none

8   of the things he did in this case were wrong.  That it was all

9   some terrible accident done out of the goodness of his own

10   heart, out of a real sense of community service and charity that

11   he repeatedly penetrated this boy month after month for over a

12   whole year.

13        Your Honor, for that reason, I simply don't believe

14   that a sentence at the low end or even at the middle of the

15   guideline range is reasonable and I would ask for a sentence at

16   the very top end of the guideline range.

17        THE COURT:  All right.  Thank you, sir.

18        Mr. Randall.

19        MR. RANDALL:  Judge, to start off with, Mr. Altman

20   started by saying that, you know, there was the type of person

21   who is caught up in a sting and drives down here, you know,

22   hoping to have sex with an underage child would face the same

23   guideline range.  That's not true.  Three of the four

24   enhancements that apply to Mr. Keelan in this case would not

25   apply to that person because there's no undue influence, there's

1   no actual sexual conduct.  And the third one which I have --

2            THE COURT:  I get your point.  You don't have to find

3   it.

4            MR. RANDALL:  That person would face a guideline range

5   of 97 to 121 months after going to trial.  So it's just not true

6   that people who face -- who are guilty of similar conduct would

7   face a similar sentence.  That's just not true.

8            You know, I've tried to make it clear in my pleadings

9   that, you know, I think the guidelines fail to differentiate

10  statutory rape between much more serious forms of sexual

11  misconduct.  There was the website I cited in my second

12  sentencing pleading that collected basically 51 instances of

13  teachers sleeping with their students.  It didn't list all the

14  sentences for all these teachers, and I understand this is a

15  website, it's not a legal publication, so there's no guarantee

16  this information is accurate.  But only two or three of these

17  people were sentenced for more than a year in prison. These were

18  teachers sleeping with underage students.

19           THE COURT:  And Florida is the place where they did it

20  though.

21           MR. RANDALL:  Well, some of them.  There was the one

22  teacher in Florida, Debra LaFave, who got probation for having

23  sex with a 13 year old boy.

24           THE COURT:  And there was the other one that got ten

25  years.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1        MR. RANDALL:  Right.  But she slept with two students.

2   That woman got ten years for sleeping with a 14 year old and a

3   16 year old, someone who clearly was predator.  That's not

4   Mr. Keelan.

5        Your Honor, heard the trial.  Mr. Keelan is someone who

6   was raped as a child and when he grew up, he fell in love with a

7   boy.  This was not about sex for him, he fell in love with J.S.

8   And it's hard for me to understand that, I'm sure it's hard for

9   you to understand that or for Mr. Altman to understand that, but

10  none of us were sexually abused as children.  And you see this

11  in many, many, many sexual abuse cases where people who suffer

12  serious sexual abuse as children go on to commit abuse as an

13  adult.  And there's no way that there can't be some causal

14  relationship between that.  That, you know, there's something

15  inside Mr. Keelan that exists that he's really not responsible

16  for.  And I think that does explain a great deal of his conduct

17  in this case.

18       You know, the fact remains there are no other children

19  out there.  This is someone, as these letters show, who is a

20  wonderful teacher.  Who has made a positive influences on the

21  lives of countless students and parents of these students, many

22  of whom I think we wound up submitting ten letters who felt the

23  need to write letters on his behalf.  I think that speaks

24  volumes to what type of person Mr. Keelan is and what he meant

25  to the lives of these people.  These aren't -- people from the

1    community don't want -- I told all these people that these
2    letters would be filed publicly and their name would be
3    associated with this case and there were some people who were
4    hesitant about that, but still ten people felt the need to have
5    their name publicly lived for Mr. Keelan expressing support for
6    him, knowing the crime he was convicted of, and I think that
7    says a lot about who he is.

8         The Government can't offer any justification for the
9    disparity in sentencing that Mr. Keelan faces, and everyone who
10   commits this crime in state court who, you know, barring any
11   prior history of sexual misconduct would face something close to
12   probation or a year in jail or two years in jail.  I don't see
13   any difference between this case and these hundreds of cases of
14   statutory rape that go on every day and are prosecuted in state
15   court.

16        You know, I understand why Mr. Keelan feels like he's
17   being targeted because he is being treated differently from the
18   overwhelming majority of people who commit this crime.  Because
19   the Federal Government chose to prosecute this case, he is
20   facing a higher sentence.  There is no way around that.  And for
21   someone in his position, it's understandable.

22        THE COURT:  But don't you think that Congress has the
23   absolute right to express the will of the people by passing
24   sentencings and punishments for offenses that are within the
25   jurisdiction of the federal courts?  Don't you think this is

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  more an indictment of the state that doesn't have enough money

2  to punish people properly than it is an indictment of the

3  Federal Government?

4          I'm not saying that it's not a very, very harsh

5  sentence, but the thought that somebody could do something like

6  this and get probation or a year kind of boggles the mind,

7  doesn't it?

8          MR. RANDALL:  You know, I would disagree with Your

9  Honor that our states lack money when it comes to putting people

10 in prison.  We seem to find plenty of prison space for drug

11 dealers and for people that commit nonviolence offenses.

12         THE COURT:  But how many people have you defended

13 recently that have 12, 14, 17 state arrests with time served,

14 withheld adjudication, they just don't have a place to put them.

15 They go in jail for a five year sentence and they're out in

16 seven months.  And then when they get over here, they faint when

17 they find out there is no parole and that they're going to go to

18 jail for whatever the sentence really is, you know, or maybe 85

19 percent of it or something like that.  I've had defendants faint

20 because they say just give me another chance.  You've already

21 had 15 chances, and I can't give you another chance unless you

22 come up with some justification for going below the guidelines.

23 And I'm not inclined to look for one in that case that I was

24 speaking of.  I don't know what their reason is.  I have to

25 assume that it is a lack of money.  I can't believe it is a lack

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    of will.

2          MR. RANDALL:  Particularly in Miami where we see most

3    of these cases that you're referring to, there is something

4    wrong with the criminal justice system.  But I don't think in

5    rural Texas or rural Kansas or, you know, these were cases taken

6    from all over the country, there's a similar issue.  You know,

7    people -- we incarcerate more people in the United States than

8    any country in the world by a factor of ten I think.

9          THE COURT:  That's true.

10         MR. RANDALL:  And so, you know, we spend a substantial

11   amount of money on incarceration.  And so there is a range of

12   sentences that people who commit this crime face and Mr. Keelan

13   is being facing a range that's way outside of that.

14         And the Government also does not rebut that the

15   guideline ranges that I fashioned, based on other defendants who

16   would be before this court facing a same guideline range or a

17   lower guideline range as Mr. Keelan.  You know, there is the two

18   point enhancement in this case for the use of a computer.  But

19   there's nothing about his use of the computer that makes this

20   offense worse.  I mean, I think that that enhancement makes

21   sense for someone who's trolling the internet looking for young

22   children to exploit.

23         But that's not Mr. Keelan.  You know, there is no other

24   victim in his background.  That was investigated.  There is no

25   one else.  This is an aberration in his life.  And so the

1    Government is -- you know, the Government wants to think this is

2    going to happen again when he gets out in his late 60s or early

3    70s and that's just not the case.  I mean, they try to exploit

4    or use the report of Dr. DiTomasso against him, but with that

5    qualification that he not be teaching in schools and not be

6    around young children or children at all on a regular basis, Dr.

7    DiTomasso, based on empirical scientific evaluation, found that

8    he was a low risk of recidivism.  And there is no getting around

9    that.  This is never going to happen again.

10         I'm not trying to diminish the severity of this

11   offense, but I just ask that the court put it in perspective

12   relative to much more serious sexual offenses that occur.

13   forcible sexual misconduct and coercive sexual misconduct.

14   That's just not present in this case, and which the guidelines

15   could not take account.

16         So I think a sentence of ten years is beyond sufficient

17   in this case.  You're never going to see Mr. Keelan again.

18   Hopefully Your Honor will be here ten years from now.

19         THE COURT:  I hope I'm anywhere ten years from now.

20         MR. RANDALL:  This is someone who has a Master's degree

21   and is going to get a job and return to being a productive

22   member of society under very strenuous conditions.  He's going

23   to be on supervised release for the rest of his life.  But

24   there's no reason to throw the book at him.

25         And this guideline range just doesn't make sense.  He's

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   being sentenced as if he were a pimp of underage children.  He

2   would be facing a lower guideline range if he had tried to

3   solicit an agent to rape underage child.  There's no getting

4   around that.  This guideline range does not make sense for him.

5          And so for those reasons, I think a sentence of 120

6   months is appropriate.

7          THE COURT:  All right.

8          Mr. Keelan, is there anything that you wish to say to

9   me before I pronounce sentence?

10         MR. ALTMAN:  Your honor, I should say that the victim's

11  father is here and has prepared a statement as well.  I don't

12  know if the court wants to allow him to speak before Mr. Keelan.

13         THE COURT:  Yeah, I probably should let him speak

14  first.  Come on.

15         MR. ALTMAN:  That's Dr. C.S.

16         THE COURT:  Come forward.  Yes, sir.

17         THE WITNESS:  You know, I've never done anything like

18  this before and didn't realize it was a competition to see how

19  many letters could be written.  I'm sure we could have gotten

20  hundreds of letters written in support of J.S. and frankly --

21         THE COURT:  I don't think J.S. is on trial.  He doesn't

22  need letters to support him.

23         THE WITNESS:  I agree.  I agree.  I feel sorry for

24  Keelan's defense attorney who had to lie through his teeth and

25  deceive everybody.  Frankly if this had been in rural Texas or

1   Kansas, I doubt that it ever would have gone to court.  It would

2   have been taken care of by people involved, which frankly was a

3   dream I've had for the last few years.

4           THE COURT:  Well, I hope you subjugate that dream.

5   Doesn't work.

6           THE WITNESS:  I did.

7           THE COURT:  Making two tragedies out of one doesn't

8   help.

9           THE WITNESS:  There's a lot of tragedies involved.

10          Yesterday I wrote something because I wanted to not

11  come up here quite as emotional as I feel now.  And I obviously

12  don't need to explain to you the need for justice here today,

13  but I do need to explain who we are.

14          J.S. is not a name, he's not a robot, he's not a piece

15  of paper, he's not something you read about in the newspaper.

16  He's a person.  So I wrote this down actually to try to go over

17  the terrible story and condense some of our feelings.  And

18  obviously I can't really express in minutes the years of our

19  sorrow and grief.

20          I know you're a busy man, a federal judge, and I

21  respect your time.  But right now I need some of it.

22          My wife and I have known each other since we were

23  teenagers in Brooklyn, New York.  Married 45 years.  My wife's

24  dream was always to have six children.  I won't go into why.

25  Her family left Europe before the Holocaust, went to Cuba, left

1   Cuba before Castro and fortunately we met in New York.

2          My parents were American born, although my father never

3   went to college.  But my father had to drop out of high school

4   to help support his fatherless family during The Depression.

5          In 1994 when my wife and I were both 46 years old, we

6   went to Paraguay.  My wife had four C sections and frankly was

7   unable to have anymore children.  I volunteered in a hospital

8   there, was Baptist Hospital in Pediatrics with a Dr. Frutos, and

9   at that time chose to adopt two infants who were both two months

10  old, a boy and a girl.  I won't go into the long process, but

11  suffice it to say that it took six months to get us back to the

12  United States with our two babies, everything done by the book.

13  As a matter of fact, our next youngest child at that time stayed

14  with us, spent a semester of high school in the American School

15  of Asuncion in Paraguay.  Our next daughter who is here, who is

16  an attorney, gave up a semester at Stanford and frankly we

17  arrived back 10 days before our number two child was graduating

18  from Yale.  Our number one child, our oldest was in medical

19  school and came on his spring break with two suitcases of baby

20  formula.

21          I bring this up really because I want you to understand

22  the focus of our family has always been on our children.  Their

23  education, their welfare.  My wife and I were not out partying,

24  we lived in Palm Springs, California, we were not country

25  clubbers, not that there's anything wrong with that, maybe now I

1   kind of wish I was, but our children were our number one

2   priority.  We wanted to create citizens of the world.  We

3   brought up our children to respect authority, we taught them

4   that teachers were an extension of their parents which almost

5   always was true.  We're old-fashioned.

6        These two youngest ones have been a blessing for us.

7   We sent them to parochial schools in an effort to reinforce

8   their identity, especially because they were adopted.  In 10th

9   grade, unfortunately J.S. had the great misfortune to have for

10  honors English, Keelan.  Now J.S. is an exceptional student,

11  National Honors Society, Dean's List, a sensitive boy with a

12  strong sense of right and wrong.  As a 15 year old though, he

13  was confused about his identity.  Who was he.  He was Hispanic,

14  he's in a parochial school, he was adopted, he was frankly

15  rather small for his age, probably about 5' tall, suffering with

16  acne, darker in complexion than most of his school mates, he was

17  vulnerable to the sly and pernicious grooming of Keelan.  He's

18  definitely a professional at dealing in influencing children.

19        He told J.S. how similar they were.  How they had the

20  same psychological profile, the Myers Briggs profile.  How J.S.

21  was, and I'll quote from one of the texts, a jungle boy and he

22  was being influenced by his quote, his Ortho mom.  He lured him

23  over and over again during lunch period at school, locking the

24  door to the classroom, putting paper on the classroom window

25  getting him to play chess or whatever and J.S. couldn't be

1    found.

2          Finally his sister Leah, they're in the same grade,

3    found him in the locked classroom.  It's very inappropriate.

4    Secretary in the school named Donna could not find J.S.  We

5    questioned J.S. what was going on, we sent him to a therapist,

6    he admitted he was confused and depressed.  He said he no longer

7    wanted to be Jewish, he no longer wanted to follow his religion

8    or any religion, he didn't believe in God.  This was the boy who

9    regardless of what school he was in, what grade, year after year

10   would win best student in secular studies, best student in

11   religious studies.  Very strange.

12         Keelan peppered him.  Texting him nightly during

13   school.  Flattered him.  Brought him into other classes to show

14   him off as what a good student is.  And that school was

15   separated as boys and girls.  He even brought him into the girls

16   class, said see, this is what a student is supposed to be.  Very

17   flattering.  He's a master.  A master at grooming.  For his

18   evil, immoral, devilish, perverted and illegal plans.  This went

19   on and on.  And he brought our son, J.S. to his Miami condo

20   without our knowledge, without our permission and had sex with

21   him multiple times.  The news said 60 times.  I don't know,

22   maybe it's 60, maybe it was more, maybe it was less.  One time

23   though is enough.

24         When J.S. transferred schools, he met him after school

25   and even sometimes during the school, took him out of North

1    Miami Beach High School, took him to a park, took him to a beach

2    to have sex with him.  He took him to motels to have sex with

3    him.  All this time J.S. was afraid to tell us what was

4    happening to him.  He started to cut himself.  We took him to a

5    psychologist.  Then to a psychiatrist, Dr. Shaw.  Chairman of

6    the Department of Child Psychiatry at the University of Miami.

7            Eventually as we confronted J.S. more and more, and as

8    things got really worse, for J.S.'s safety, and with

9    recommendations, he was sent for intense therapy to what's

10   called wilderness therapy, something I had never heard of

11   before.  There was no phone, no internet, they didn't even sleep

12   in a tent.  And it cost over $400 a day.  He was there over 100

13   days.  It was there with the therapy that the Keelan story came

14   out in detail.  We had no way of speaking to J.S., phone calls

15   were not allowed, but we would get a weekly letter, a weekly

16   update.  I remember reading his letter, his confession, his

17   letter of responsibility, they called it, with my wife.  You

18   could imagine how we felt.  After that I remember sitting alone

19   in the dining room, taking two nitroglycerin pills which I've

20   never taken before in my life.  The details were graphic and we

21   were stunned and sickened by it.  For our poor son and for

22   ourselves.  We felt guilt, shame, hatred of the fools Keelan had

23   made of us.

24           This is not some innocent gee, I made a mistake.  He

25   killed years of J.S.'s life.  He killed his spirituality and

1   physically and hopefully, J.S. can some day recover some of his

2   identity and soul.  Even though some things do heal eventually,

3   but scars remain forever.

4          As parents, my wife and I will never, ever not in 20

5   years or however long or more until we die get over this.  We

6   love our son, but lost a certain trust and relationship with him

7   and only now is it starting to heal.

8          Keelan And his devilish, evil, selfish, lying ways has

9   stolen years from our lives as well.  All of our children have

10  suffered.  My 97-year-old mother, who I guess found out from my

11  sister-in-law, she lives with my brother in California, my

12  wife's sister and her children.  My brother and his children.

13  All of our children, thank God our grandchildren are too young

14  to know.

15         Please remember, Judge please, that Keelan taught

16  acting as well as English.  And if he apologizes or claims he

17  was in love, please remember what a phony liar and manipulator

18  he is.

19         I'm sure he's sorry.  So sorry, though but what he's

20  sorry about is sorry he got caught.  It's just another act.  He

21  loves only himself.  He and his perverted criminal ways.  In

22  fact, I believe he confessed immediately after when he was

23  caught, but later demanded a trial anyway, not only wasting

24  thousands of dollars and time, but with no regard or remorse for

25  the torture he put his victim through, our son J.S., or us, the

1    silent victims here.  The collateral damage.

2         Judge, please remember the teenage boy who had to stand

3    there and testify for part of two days.  With his predator

4    looking at him.  Who, as he left the room, burst out crying in

5    his mother's arms from the shame and degradation.  Remember the

6    incredibly short time it took the jury to convict on all counts.

7         Cancer is a difficult disease all around.  More and

8    more is discovered over time, but what's been known for decades

9    is that it's a disease that flourishes with a weakened immune

10   system.  That's not new information.  Everyone in this room at

11   this moment probably has some abnormal cells in their body,

12   which if this body is compromised immunologically may develop

13   into cancer.

14        Almost three months into J.S.'s time in wilderness

15   therapy, a long time after we found out about Keelan and his

16   repeated rape of our son, of incredible stress and sadness for

17   all of us, I was diagnosed with cancer.  Never sick a day before

18   in my life.  As a horse.  I now have had nine hospitalizations.

19   Multiple surgeries.  Chemotherapy, a heart attack, then heart

20   surgery.  The cancer spread to my lung and I've had two more

21   lung surgeries and it's come back again.

22        I regret saying this in front of him for the perverse

23   pleasure it must give this prisoner, Keelan.  I'm supposed to

24   have had another cancer surgery, but I wouldn't miss today, so I

25   postponed it.  We leave next week for MD Cancer Institute in

1    Houston.

2         It's fair to say with no exaggeration that Keelan has

3    taken years off my life, years off the life of my wife.  Neither

4    of us have had a full night's sleep since we found out about

5    this nefarious creature's deeds against our son, and frankly

6    against all of our sanity.  How many nights did I lay awake in

7    bed thinking of ways to avenge what took place.  In fact,

8    without naming anyone, the day of his arrest last June, after

9    hearing the great news of Keelan's arrest by FDLE, FBI, Broward

10   police, Broward Sheriff's Office or whatever law enforcement

11   agency it was said to me that it must have been almost

12   impossible to have not gone and taken care of this monster

13   myself.  This commented, I should be proud of my restraint,

14   frankly, as you just did.

15        My restraint though, it's almost funny.  Keelan killed

16   our son's soul and identity.  He killed our faith, at least

17   mine, for a long time.  Definitely shortened our lives on this

18   earth, our time with our children and grandchildren.  And

19   frankly, has cost us over $200,000 in therapy, in residential

20   treatment centers, in wilderness therapy and that's up until

21   today.  It could have easily paid for an Ivy League education or

22   whatever.  Would have been better spent.  I do not remember the

23   last time I have smiled or my wife, who has aged probably 20

24   years, in the last two.  She now has been diagnosed with

25   coronary artery disease and frankly has gained over 25 pounds in

1   the last two years.

2        Keelan should never, ever, ever be allowed out of

3   prison, never to see the sunlight or a blue sky, never to see a

4   butterfly.  Never to smile again.  Never, ever again.  No more

5   Keelan victims of this phony, self-serving, evil creature.

6        Is killing a soul less important or less a crime than

7   killing a body?  We've been told that he can get life

8   imprisonment.  Frankly, it sounds like a rather light sentence

9   compared to the life imprisonment and shortened lives he's

10  caused for our son, our entire family and for us.

11       Thank you much for listening to me, a man with a broken

12  heart and spirit.  Please let the maximum punishment for this

13  pervert, this predator of children, of our son, allow him and us

14  some level of relief and a chance to heal and have faith again.

15       I could go on forever.

16       THE COURT:  Not in here you can't, but I appreciate

17  your sentiment.  Thank you, sir.  Thank you very much.

18       Mr. Keelan?  You can do it from there, sitting, or you

19  can come to the lectern.  Either one.  It's your call.

20       THE DEFENDANT:  I don't know where to begin.  I'm

21  guilty.  I've said back at the beginning that I was guilty.

22  That I slept with J.S.  When Agent Cannon first was sending

23  e-mails as J.S. the year before, I said I would do anything to

24  help J.S. if he asked.  I meant I would turn myself in.

25       When J.S. called last June, I said I had to decide if

1   what you need is for me to come down and tell the truth to turn
2   myself in, I'll turn myself in.  This is, and I said it three
3   times on the phone.  That I jumped at the chance, Mr. Altman
4   says, it's not true.  Agent Cannon sent me e-mails.  I was
5   confused because J.S. had said that the relationship was over,
6   that he didn't want that and when he was saying I need you, I
7   want you, I didn't know what -- I was confused because I did not
8   want to harm J.S.

9           I'm sorry for Dr. S.'s cancer.  As much as there's a
10  difficulty between us, it's also on the phone, I said no one
11  deserves, no one deserves to have such trouble.  The two people
12  I most need to apologize to right now are the two people I love
13  the most.  One of those is my son Tristan who is here, who's had
14  to bear the shame of this.  And today's his birthday, so I'm
15  saying happy birthday from here because I won't see him.

16          The other was J.S.  And I apologize to J.S.  I do feel,
17  and I committed statutory rape, I absolutely loved J.S.
18  unreserved --

19          AUDIENCE MEMBER:  Your pants are on fire.

20          THE DEFENDANT:  It's not true, Dr. S., I'm sorry.  J.S.
21  came to me cutting.  The cutting did not start.  I slept with
22  J.S. on February 14th, the first time of what 2010.  He came in
23  that fall cutting.  He was as, Dr. S. said, confused, you know,
24  about his religion.  He didn't talk about sex at that point, but
25  he said he didn't want to be Jewish, he wasn't out there and he

1    kept cutting and he came to me about the cutting and he came.

2    And he got in my heart.  And I told him, I talked to Dr. S.

3    about it, I called him twice, they knew about the cuttings long

4    before it was out there.  I tried to put him in touch with a

5    student who is a heterosexual who they investigated who is

6    similar to J.S. that he might be friends with.  I called the

7    counselor friend to try to get some advice about what could be

8    done.  I bought him The Road Less Traveled, which I thought was

9    the best psychology book I could get and I eventually told him,

10   I promised him unconditional love and I meant unconditional and

11   that I would do anything to help him be happy.   I would.

12         And I got too emotionally involved.  I loved him.  Dr.

13   S. says he has two wonderful children, he has two wonderful

14   children.  I taught them both.  J.S. and Leah are wonderful

15   people.  J.S. is witty and bright and kind and fears for his

16   freedom in fighting to be someone.  And he came to me, he did.

17   He thought I was a wonderful person and I tell against what

18   everyone said, I said don't fight with your family, you don't

19   have to decide not to be Jewish now, this is not something you

20   have to deal with, it doesn't have to go there, just don't cut.

21   Just don't cut.  If you don't love yourself enough, believe me

22   that I love you enough to stop that.  And I wasn't in love with

23   him at that point.

24         I know that I wouldn't have asked him for sex.  I spent

25   a life not manipulating people.  If I ever did anything with a

1   student, I'd say I'm giving you daily quizzes because you're not

2   going to read the assignment otherwise.  I lay it out there.  I

3   can't lie.  I didn't.  I can't lie.  I'm no good at it.

4            Agent Cannon, I told him the truth as soon as he was

5   there.  I said on the phone to J.S. three times I'll come down

6   and tell the truth.  I wanted to tell the truth.  I've lived

7   with ferocious anxiety since, you know, since this happened.

8            J.S. came over to my apartment.  I was trying to get

9   him to do Shakespeare.  That worked with Max, the other student,

10  as an outlet.  He said he was coming over.  He was playing

11  tennis.  And so you see, he was coming over, he was going to be

12  there.  He would come over.  We work on the Shakespeare.

13  There's paperwork he had to do.  He came over and he asked me

14  for sex.  He told you that he asked me.

15           The grooming thing, and he told you that I tried to

16  talk him out of it.  He mentioned something before and I said

17  it's a really bad idea and I said J.S., I love you, but this is

18  just -- you know, he told you the first thing I said to him is I

19  can love you without sex.  He told you that at the trial.  I

20  could love him without sex.  I'm gay, but I just wanted this

21  fantastically wonderful human being to stop hurting himself.  I

22  said I'd do anything.  I'd do anything.  You know, I don't lie,

23  I'll take any test of truth you want on these statements.  I

24  told him I could love him without sex.  And he said well, you

25  don't have to.  I told him in the grooming thing, I said you

1    don't owe me sex for love.  I thought maybe he thought he owed

2    it to me because he knew I was gay at that point, and I said you

3    don't owe it to me.  He says -- he said I know I don't owe it, I

4    want it and so do you.

5         And I'd be lying if I didn't think he was attractive.

6    He's a lovely person.  He's not the most handsome person I'd

7    ever seen.  He did have acne or whatever, but his soul is a

8    wonderful person.  Wonderful person.  And told him, I said J.S.,

9    the sex, this is the bad part, the sex is not important.  I said

10   don't ask me to do this for sex.  It's not that important.  And

11   he said it was not for sex, it's for true love.  We're soul

12   mates.  And he said I need it to live.  And he told you at the

13   trial he believed he needed it to live.

14        I feel like you think gay people can't love each other.

15   I knew I shouldn't love him.  I knew I shouldn't love him.  I'm

16   guilty.  I'm guilty of statutory rape, Mr. Altman.  I tried to

17   plead to statutory rape.  I asked to so J.S. wouldn't have to

18   testify.  That's on record.  That he believed he needed it to

19   live is on record.  He said so.  He said so at the trial.  And I

20   found myself in the situation where this fantastic human being

21   says I need -- you're so wonderful he's saying to me, that the

22   only relationship with you can save my life.  Your soul mate's

23   life.  And I didn't.  I didn't.  I talked for two days.  That

24   was February 14th.

25        If you look at the statement that he sent from rehab,

1   he said nothing happened that first day, because nobody brought

2   -- we made a date and nobody brought it up.  We didn't make a

3   date, doesn't make any sense that I made a date with him and

4   then when he came to do the date, I tried to talk him out of it.

5   He told you I tried to talk him out of it.  If I tried to talk

6   him out of it, how was I trying to talk him into it.

7            THE COURT:  Mr. Keelan, try to organize your thoughts a

8   little bit.  I'm not angry, I'm just trying to get you to focus

9   and tell me what you want.

10            THE DEFENDANT:  I know.  But I spent a day, I spent

11   that full day, nothing happened because I said no a dozen

12   different ways.  I told him that, you know, I said J.S., look

13   when it comes out, because it will come out, and you know, it

14   came out when he was 18 and I was 54.  And we were -- if we were

15   married, it will still come out.  J.S., everybody is going to

16   hate me.  They're all going to assume that I tried to get you to

17   do this.  And he said I'll tell them I picked you.  Besides, it

18   won't matter because we'll be together.

19            I -- honestly in Virginia, had a recurring dream of

20   visiting Gettysburg with him because he was a history buff, and

21   we talked about history, philosophy, psychology and all of those

22   things.  And I had given up all the sex to be able to go with a

23   history geek to Gettysburg.  I'd give all of it back to have

24   kept his friendship.

25            He's a wonderful person.  An absolutely lovely,

1   marvelous, weird, eccentric, interesting person and I loved him.

2   And I had said no and I made it through no, and I made it

3   through nos the next day.  And he said it was going to be with

4   some other older white guy.  And he told you that at trial and

5   honestly, at that point I got selfish.  I wanted the love, I

6   wanted someone who loved me so much that 35 years didn't make a

7   difference.  He loved me that much.  And when he said it was

8   going to happen anyway and he was going to go out with someone

9   else, I wanted the love.  I paid, I paid the sex for his love, I

10  wanted that, I wanted it forever.

11        And the things Mr. Altman says, who tied who up, went

12  this way, that way, the sex, I never did anything.  You can look

13  back through all the e-mails and all the phone calls, I never

14  did anything that J.S. didn't ask me to do.  And when he called

15  me up and said it was over, I didn't ever ask him.  That's why

16  they didn't want the e-mails in, I never asked him for sex.  I

17  never asked him.  I asked him to be happy.  I said all you owe

18  me is your well-being.  That's what I told him.  That's what I

19  wanted.

20        When he disappeared off the e-mails, yes.  First of all

21  I came to Florida on vacation because people come to Florida on

22  vacation.  And I lived here for seven years, I did drive around

23  the neighborhood.  I said that.  I wanted to see if he was

24  alive.  I just wanted him to be alive.  All I wanted was -- it's

25  not all I wanted, I'm minimizing it, I shouldn't do that.  I

1    thought he was lovely.  When he said he was -- he wanted gay sex

2    with me, I thought he was a lovely person who I was already in

3    love with.  And I said no, no, no.  I didn't make it sound like

4    I was tortured for sex.  I loved the sex with J.S.  I loved J.S.

5    It was sex with somebody I loved.  It was wonderful.  I'm not --

6    I can't say that I didn't want it, but I tried, I tried to talk

7    him out of it.  I would have waited, I -- I'm sorry.

8         THE COURT:  Mr. Keelan, focus.  Focus.  You've been

9    going for 15 minutes now.  I'll give you two more minutes and

10   then wrap it up.

11        THE DEFENDANT:  I'll stop.  And I can't count the

12   number of ways I told him I wasn't that special.  He said you're

13   special to me.  You know, I told him he was going to want to see

14   other people, I told him he should be with people his own age,

15   he said I was a dream for him, he's always been attracted to

16   older guys.  I wouldn't have believed that, I believe that, now

17   a whole bunch of stuff I learned afterward.  I traded the sex

18   for the love.

19        I mean I gave in, I could have -- I didn't need the

20   sex.  I'm not ugly, I can get sex in Florida, I didn't.  J.S., I

21   let myself believe that this was saving his life.  And that's

22   wrong and it's silly and he said that and I let myself believe

23   it.  I saw this young gay man and he's lonely and he's upset and

24   he's cutting himself.

25        I apologize, I've lost everything.  I've lost, you

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   know, the friends who love me are gone, my job's gone, my

2   future's gone, prison is horrible, my life is pointless, and

3   Your Honor, I lost J.S.  I could have been the great friend for

4   the rest of his life.  I can't -- I saw him at the trial, I

5   tried to plead to statutory rape, I did not want that.  I didn't

6   feel like I had tried to seduce him.  I felt -- I am so sorry

7   for any suffering I caused him.

8          On top of everything else, my stupidity, my romantic

9   idiocy, I believe -- you know, I believed that the love would

10  last forever and as soon as the sex got in, I should have known

11  that it would be ruined and I lost the person I love.  And I'm

12  sorry for I cannot -- if I could go back in time and change it,

13  if I could fix it for him, if I could make it up to him somehow,

14  I would.  He deserves all joy, he deserves a wonderful marvelous

15  life.

16         And you have to believe I tried out of love to do

17  something and I let myself get lost in a moral hall of mirrors

18  where I thought what I was doing, where I convinced myself what

19  I was doing was right.  But I didn't ask him, I tried to talk

20  him out of it, he told you that.  I could have loved him without

21  that.

22         I'm sorry to his family, I'm sorry to his son, nothing

23  -- I had 12 and 1,300 students.  This happened once.  It was the

24  strangest situation in which I've ever found myself and I don't

25  know, some strange situations are going to happen in prison, but

1    this is pretty much the oddest thing I ever found myself in and

2    I loved him.  I love him, I have prayed for his happiness every

3    night for three and a half years now, I don't know where my

4    prayers go, I don't know what they do.

5         We talked about this, J.S. and I, at some point.  But

6    all I can do to love him now, is pray for him to be happy and

7    I've done it every night for three years.  Nobody believes me, I

8    can't lie, I'm a horrible liar, that's what happened.  Test me

9    if you want to.

10        I fell in love with him.  I committed statutory rape.

11   I'm guilty, I'm guilty, I'm guilty.  I'm sorry to take so much

12   time.

13        THE COURT:  Thank you, sir.

14        Mr. Randall, anything further?

15        MR. RANDALL:  No, Your Honor.

16        THE COURT:  I will, in the formal order, recommend that

17   the defendant serve his time at FCI McKean in northwest

18   Pennsylvania or FCI Otisville in New York, depending upon his

19   background and the offense of which he stands convicted, and the

20   needs of the Bureau of Prisons.

21        The court has considered the statements of all the

22   parties, the presentence report which contains the advisory

23   guidelines, and the statutory factors as set forth in 18 USC

24   section 3553(a).

25        Based on the need to provide just punishment to deter

1   the defendant, the need to protect the public from further

2   crimes of the defendant, a sentence will be imposed within the

3   advisory guideline range.

4         It is the finding of the court the defendant is not

5   able to pay a fine as well as make any restitution.

6         It is the judgment of the court that the defendant,

7   Thomas Patrick Keelan, is committed to the Bureau of Prisons to

8   be imprisoned for 200 months.

9         This sentence consists of terms of 200 months as to

10   each of Counts 1 and 2 to be served concurrently.

11         It is further ordered -- you made a request for

12   restitution?

13         MR. ALTMAN:  Your Honor, I believe Probation did send a

14   letter to the family.

15         THE COURT:  Nothing's come back.  They were given a

16   time and nothing has come back.  Those things are not

17   open-ended, we got to have it.

18         AUDIENCE MEMBER:  I can provide the bills, but it's my

19   impression that he doesn't have two cents to rub together.

20   Probably spent it on sex toys.

21         MR. ALTMAN:  I apologize, Your Honor.

22         THE PROBATION OFFICER:  Your Honor, the letter was

23   provided to the victim's father on February 14th with a deadline

24   of March 7th to return the affidavit of loss.

25         THE COURT:  Okay.  No restitution has been made, claim

1    for restitution, no claim will be made at this time.

2           MR. ALTMAN:  No claim has been made, Your Honor.  We

3    would ask, as we're entitled to ask for a period of 90 days, but

4    we'll have it soon before then, Your Honor.  If you want, I'll

5    get together with them this week and next and put something

6    together.

7           THE COURT:  See, the problem is I don't want to pay for

8    this gentleman to be flown back down here.  He has a right to be

9    at his restitution.  I don't really propose that we spend money

10    bringing him back down here.  We could have done this today and

11    that's why the letter went out in February, which gave a

12    deadline of March the 5th and it's now what April the 11th?  And

13    we have heard nothing.

14           MR. ALTMAN:  What if we set it for next week, Your

15    Honor?  And that way Mr. Keelan will still be here.

16           THE COURT:  I will set it for next week.  Wanda, give

17    me a date next week.  But that's it, no more extensions.

18           COURTROOM DEPUTY:  Thursday April 18th.

19           THE COURT:  Thursday April 18th at?

20           COURTROOM DEPUTY:  2:00.

21           THE COURT:  2 p.m., okay?  Thursday April 18th.

22           It is further ordered that pursuant to 18 USC section

23    3664(d)(5), since the victim's losses are not yet ascertainable,

24    I will set a date which was Thursday April 18th at 2:45?  Is

25    that what you said?  2:00.  I'm sorry.  2 p.m.

1          MR. RANDALL:  Can we move it back a little bit, Your

2     Honor?  I think I have a sentencing.

3          THE COURT:  What do you mean back, which way does that

4     mean?

5          MR. RANDALL:  Either way.  1 or 3:30 maybe.

6          THE COURT:  Wanda, can we do it --

7          COURTROOM DEPUTY:  3:30.

8          THE COURT:  3:30 is fine, April 18th at 3:30 p.m. for a

9     final determination of the victim's losses.

10          Upon release from imprisonment, the defendant shall be

11     placed on supervised release for a term of 25 years as to each

12     of Counts 1 and 2 to be served concurrently.

13          Within 72 hours of release, the defendant shall report

14     in person to the probation office in the district where

15     released.  While on supervised release, the defendant shall not

16     commit any crimes, shall be prohibited from possessing a firearm

17     or other dangerous device, shall not possess a controlled

18     substance, shall cooperate in the collection of DNA and shall

19     comply with the standard conditions of supervised release

20     including the following special conditions:

21          Financial disclosure requirement, no new debt

22     restriction, no contact with minors, no contact with minors in

23     employment, no involvement in youth organization, sex offender

24     treatment, restricted from possession of sexual materials, Adam

25     Walsh Act search condition and sex offender registration as

1    noted in part G of the presentence report.

2          The defendant shall immediately pay to the United

3    States a special assessment of $200.

4          The total sentence 200 months imprisonment, 25 years

5    supervised release, $200 special assessment.

6          Now that sentence has been imposed, does the defendant

7    or his counsel object to the court's finding of fact or the

8    manner in sentence was pronounced?

9          MR. RANDALL:  Yes, Judge, we do reserve all objections

10   previously raised.

11         THE COURT:  All right.  There are no additional counts.

12         You have the right the appeal the conviction and

13   sentence imposed.  Any notice of appeal must be filed within 14

14   days after the entry of the judgment.  If you're unable to pay

15   the cost of an appeal, you may apply for leave to appeal in

16   forma pauperis.

17         We'll be in recess.

18         MS. JOHANNES:  Have a good afternoon, Your Honor.

19         THE COURT:  Thank you.  Thank you, Madame Probation

20   Officer.

21             (PROCEEDINGS CONCLUDED)
                      * * * * *

22
                    C E R T I F I C A T E
23   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
24   _____        /s/ Dawn M. Whitmarsh
     Date                    DAWN M. WHITMARSH, RPR
25