UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CIVIL CASE NO. 17-CV-20158
(CRIMINAL CASE NO. 12-20496-CR-MARTINEZ)

THOMAS KEELAN,                          :
                                        :
        Petitioner,                     :
                                        :
            v.                          :
                                        :
UNITED STATES OF AMERICA,               :
                                        :
        Respondent.                     :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .:

**MEMORANDUM IN SUPPORT OF PETITION
TO VACATE CONVICTION AND SENTENCE**

The Petitioner, THOMAS KEELAN, through undersigned counsel, respectfully
files this Memorandum in Support of his Petition to Vacate Conviction and Sentence
pursuant to 28 U.S.C. § 2255.   For the reasons set forth herein, Mr. Keelan's
convictions and sentence should be vacated; to the extent that he is not entitled to have
his convictions and sentence permanently annulled, he seeks a new trial and/or
sentencing proceeding; to the extent the Court declines to grant this motion as a matter
of law, Mr. Keelan asserts his right to an evidentiary hearing to demonstrate his
entitlement to the relief sought herein.

**I. PROCEDURAL BACKGROUND**

On June 29, 2012, a grand jury in the Southern District of Florida returned a two-
count Indictment. (DE 7). Count One charged Mr. Keelan with using a means of
interstate commerce (the Internet and a cellular telephone) to knowingly persuade,

1

induce, entice, or coerce J.S., a minor, to engage in sexual activity for which any person could be charged with a criminal offense, in violation of Title 18, U.S.C. § 2422(b), beginning in the fall of 2009 and continuing through the summer of 2011. *Id.* Count Two charged Mr. Keelan with knowingly <u>attempting</u> to persuade, induce, entice, or coerce J.S., a minor, to engage in sexual activity for which any person could be charged with a criminal offense, in violation of Title 18, U.S.C. § 2422(b), beginning on or about May 9, 2012, and continuing through on or about June 16, 2012. *Id.*

Discovery was provided by the Government to Petitioner's trial counsel. Among other things, the discovery included emails and text messages sent by, or at the direction of, law enforcement posing as J.S. to the Petitioner, an email about J.S.'s communications with other men the same age as Petitioner, a 14-page letter written by J.S. to his parents about his mental state and sexuality, his preference for men Petitioner's age, his communication of affection and sexual desires to men Petitioner's age, and his sexual overtures to other men Petitioner's age prior to meeting Petitioner. Petitioner's trial counsel engaged the services of an investigator – although the record is silent as to what, if anything, the investigator was asked to investigate. Additionally, and, while the record is also silent as to whether Petitioner's trial counsel issued any subpoena for documents, records, or witnesses in anticipation of trial, the record is clear that Petitioner's trial counsel filed no motions to compel discovery on the basis that the Government was withholding evidence.

Nevertheless, on October 23, 2012, Petitioner's counsel filed "Defendant's Sealed Motion to Introduce Evidence", pursuant to Rule 412(b), Federal Rules of

Evidence.   (DE 29).   The Motion sought an order from this Court allowing the introduction of evidence that J.S. had "engaged in consensual sexual activity with 40-50 individuals, all of the same age and demographic background as Mr. Keelan," and that the evidence was relevant to rebut the accusations that Mr. Keelan had enticed, persuaded, or induced J.S. to engage in sexual activity, and that he had "groomed" J.S. to engage in conduct he would not have otherwise performed.  *Id.*  The Motion included no specific offer of proof, it failed to indicate what evidence it was based upon, and it failed to seek the admission of evidence of J.S.'s mental state as impeachment, to rebut an element of the offense, or as victim character evidence under Fed. R. Evid. 404(a)(2)(B).   Three days later, by its sealed order of October 26, 2012, the Court denied the Motion.  (DE 34).

On January 19, 2013, Petitioner's trial counsel filed a Second Motion in Limine, seeking to exclude any evidence or testimony concerning the details of Mr. Keelan's sexual relationship with J.S., on the basis that, pursuant to 18 U.S.C. § 2422(b), the issue at trial was not whether the sexual relationship had in fact existed—Mr. Keelan agreed that it had—but whether or not Mr. Keelan induced or enticed J.S. into it.  (DE 73). The evidence sought to be excluded included: 1) testimony pertaining to the number and location of sexual encounters between the two; 2) the actual "sex toys" found in Mr. Keelan's car; and 3) the gay pornographic DVDs found in Mr. Keelan's car and home.  *Id.*  By order of January 24, 2013, the Court denied the Motion in Limine, holding that the details of Mr. Keelan's admissions would not only lend credibility to the testimony of J.S., particularly on the issue of who was the dominant party in the

3

relationship, but would also tend to rebut any argument that Mr. Keelan's statement was coerced or involuntary. (DE 85). At oral argument prior to jury selection, the Court reaffirmed its ruling. (DE 123 at 3).

While there is evidence in the record (DE 206) that Petitioner asked his trial counsel to issue subpoenas for J.S.'s various social media accounts, email accounts, or cellular telephone records, there is no evidence in the record that Petitioner's trial counsel did so.

The trial commenced on January 22, 2013. (DE 81).  At the conclusion of the government's case, the defense moved *ore tenus* for a judgment of acquittal pursuant to Rule 29, Federal Rules of Criminal Procedure, which the Court denied. (DE 87).  No defense case was presented, and the parties filed joint jury instructions.  On January 25, 2013, the jury returned verdicts of guilt as to both counts of the Indictment. (DE 93). Sentencing was set by the Court for April 11, 2013.  (DE 112).

At sentencing, the Court imposed sentences of 200 months (16 years, 8 months) on Counts 1 and 2, to be served concurrently, followed by 25 years of supervised release with certain special conditions. (DE 114).  On August 2, 2013, a restitution hearing was held before Magistrate Judge McAliley, who issued a Report & Recommendation (DE 160; hereinafter "R&R") finding, *inter alia*, that the expenses incurred by J.S.'s parents for psychological and therapeutic treatment were directly and proximately related to the Petitioner's criminal conduct beginning February 14, 2010, the day on which the sexual relationship commenced.  (Judge McAliley found that, given the myriad reasons for J.S.'s pre-existing mental state, the government had not

4

established that the petitioner's unlawful conduct was the direct and proximate cause of J.S.'s need for services prior to that date.)  The R&R, which was entered on October 29, 2013, recommended payment of restitution in the amount of $104,886.05.  On January 3, 2014, the Court entered its order (DE 173) adopting the R&R in its entirety.

On April 26, 2013, a Notice of Appeal was filed. (DE 120).  On September 2, 2015, the United States Court of Appeals for the Eleventh Circuit affirmed Petitioner's conviction and sentence.  (DE 195).  A Writ of Certiorari to the United States Supreme Court was thereafter filed on November 20, 2015, that was subsequently denied on January 12, 2016. (DE 196).

On February 23, 2016, the petitioner filed a *pro se* Motion for Discovery pursuant to Rule 6(a) and 6(b) of the Federal Rules of Civil Procedure and a motion to have counsel appointed. (DE 197). The Court denied the motion on May 16, 2016. (DE 203). The petitioner then filed a Motion for New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (DE 206). The motion was denied. (DE 210).

## II. FACTUAL BACKGROUND

This matter concerns Petitioner's relationship with his student, J.S. J.S. was a troubled teenager in Petitioner's class in the fall of 2009. Unbeknownst to Petitioner, beginning in approximately 2007, J.S. would frequently engage men the Petitioner's age on gay chatrooms on various websites where he would seek older men for sex chats. *See* Affidavit attached as Exhibit A.  Apparently, and as J.S.'s letter to his parents corroborates, one of the men that he communicated with was Knute Rondum.  *See* Exhibits A and B.  Despite being provided J.S.'s letter in discovery, neither Rondum nor

5

any of the other older men mentioned in the letter were contacted by Petitioner's trial counsel prior to trial.  Nor was there any investigation conducted concerning the acts mentioned in J.S.'s letter by the investigator retained by the defense.

According to Rondum, he and J.S. communicated via Skype three to four times a year for several years.  *See* Exhibit A.    Rondum advises that during these communications, J.S. would often appear with his shirt off to show Rondum his physique while making comments such as "you can see I'm thin and muscular" and J.S. made it clear that he was seeking a romantic relationship with an older man and claimed he was sexually active with older men all the time.  *See* Affidavit attached as Exhibit A.  This type of activity was also corroborated by J.S. in his letter to his parents.  *See* letter attached as Exhibit B.  Both Rondum and J.S. have also independently stated that J.S. had many sexual experiences with other men at movie theatres or various hotel rooms.  *See* Exhibits A and B.

J.S. and Rondum both verified that they eventually met in person, in Florida, at a service stop on I-75 between Naples and Miami.  *See* Exhibits A and B.  J.S. recalled meeting with "Knute" and talking for hours until J.S. propositioned sex and Rondum did not want to speak any further.  *See* Exhibit B.  Rondum corroborates this.  *See* Exhibit A.   Mr. Rondum also states that J.S. continued to pursue him for sex whenever they communicated thereafter.  *See* Exhibit A.

Eventually, in the fall of 2009, Mr. Keelan, then 52 years old, met J.S., who was then 15 and a student in Mr. Keelan's class.  Mr. Keelan and J.S. became close.  They spoke and met often, both at school and after school hours, and eventually the two

6

began a sexual relationship that involved between 30 and 60 encounters at various locations, including Mr. Keelan's apartment, a motel in Hollywood, Florida, and on a secluded island in Oleta River State Park in northeast Miami-Dade County. Mr. Keelan admitted that the two had sex for the first time on February 14, 2010.

Unbeknownst to either J.S. or the Petitioner, in May of 2010, J.S.'s father contacted law enforcement and stated that J.S. was sexually molested by Petitioner. Special Agent Donald Cannon was assigned to the matter. J.S.'s father met with Agent Cannon and stated that he found text messages and emails between J.S. and Petitioner regarding sexual encounters and provided Agent Cannon with his computer and information related to J.S.'s accounts.

Mr. Keelan resigned from his position at J.S.'s former high school and moved to Roanoke, Virginia in the fall of 2010. According to J.S., they maintained contact via e-mail and text messages up until J.S.'s placement in wilderness camp, at which time he ceased contact as he lacked the means to maintain contact with Mr. Keelan.

Special Agent Donald Cannon obtained the consent of J.S.'s parents to assume the online identity of J.S. when J.S. was sent away. (DE 135 at 476). This included access to J.S.'s Hotmail email account and Yahoo messenger. Subsequently, all account passwords were changed by law enforcement and law enforcement maintained control of several of J.S.'s accounts from August 15, 2011, to the present day. (DE 135 at 476).

While J.S. was in wilderness camp, he handwrote a letter to his parents explaining and justifying his conduct. *See* Exhibit B. The letter dated August 24, 2011,

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

detailed all of J.S.'s encounters with older men, and stated that while he did "not know specific dates or last names" but "[l]uckily" his parents did. *Id.* The letter also contained a wealth of information about J.S.'s mental state. For example, J.S. stated in his letter that he did the acts for "freedom, for love and belonging and power and control." *See* Exhibit B. J.S. continued to say that "it was power and control for the fact that it was [his] body and no one . . . could take that away from him." *Id.* Moreover, J.S. referred to the acts as "fun" and that it "was freedom since no one tells [him] to stop and [he] had the choice to commit the act." *Id.*

To be sure, J.S.'s parents were well aware that J.S. had made efforts seeking out older men for several years. Indeed, J.S.'s sister, even emailed an attorney requesting legal assistance for J.S.'s parents who knew that J.S. was involved with "pedophiles." *See* email attached as Exhibit C. According to the email, J.S. had "sexual chats, sexting, pics, and videos where these pedophiles asked him to do sexual tricks via skype and yahoo messenger." *Id.* The family knew that J.S. met these men on Facebook and dating websites like gay.com or sex.com and they were able to locate email communications between several of the men and J.S. *Id.*

Yet the jury never heard that J.S. was actively seeking older men on social networking websites such as gay.com, boysfordaddies.com, and Facebook <u>for over one year</u> before he even met the Petitioner because defense counsel never attempted to subpoena any records.

Beginning around May 9, 2012, under the supervision of law enforcement, J.S. again contacted Mr. Keelan, using a ruse to explain his extended absence, and their

conversations resumed.   Eventually the discussion turned to Mr. Keelan's desire to travel to South Florida to visit with J.S. in September of 2012, when J.S. would turn 18 years old.   J.S. urged Mr. Keelan to make the trip sooner, saying, among other things, that he could not wait until September to see him.

The government called three main witnesses at trial: Special Agent Donald Cannon, expert witness, Doctor Terri Patterson, and the alleged victim, J.S.   (DE's 132, 133, & 135).   While agent Cannon testified about the investigation and expert witness, Terri Patterson testified about how Petitioner altered J.S.'s mental state, J.S. was the government's "star witness."   J.S. testified he was struggling with various identity issues related to his ethnicity, religion, and sexual orientation at the time he met Petitioner. (DE 132 at 227).   This was certainly untrue with respect to his sexual orientation as evidenced by J.S.'s letter.

During the trial, the Government introduced evidence that on June 15, 2012, Mr. Keelan drove from Roanoke, Virginia, to an intended rendezvous with J.S. This encounter was scheduled for the next day at a motel in Hollywood, Florida, where he and J.S. had gone for a prior tryst.   During the trial, defense counsel failed to object to the introduction of this into evidence despite it amounting to a constructive amendment of the Indictment.

The Government also introduced evidence that on June 16, while *en route*, Mr. Keelan exited Interstate 95 at Ft. Pierce, Florida, and stopped at the Lion's Den, an adult boutique, where, still under surveillance, he purchased two sex toys known as "cock rings," then resumed his journey.   Again, defense counsel failed to object to the

9

introduction of this into evidence despite it amounting to a constructive amendment of the Indictment. Eventually Mr. Keelan arrived at the Hollywood Gateway Inn, where he had reserved a room with a king-size bed for seven days, to accommodate two adults, using an Internet-based travel website. Immediately after checking in, Mr. Keelan was arrested in the lobby by agents of the Florida Department of Law Enforcement (FDLE).

Following his arrest, Mr. Keelan was taken to the Hollywood Police Department, where he waived his Miranda rights and gave two statements, which were audio- and video-recorded. He acknowledged, *inter alia*, that he had been J.S.'s English teacher at the high school; that the two had commenced a sexual relationship around February 14, 2010; that the two of them had had sex approximately 30 times; that J.S. had repeatedly approached him requesting sex, despite Mr. Keelan's protests; and that he had made this trip to Hollywood for the purposes of seeing J.S., at J.S.'s instigation.

During the trial, the Government introduced the contents of Mr. Keelan's vehicle that was searched after his arrest as evidence. An array of sex toys including butt plugs, dildos (artificial penises), whips, nipple clamps, restraining devices, a feather duster, latex gloves, containers of amyl nitrate (which, when inhaled, assists in relaxing the sphincter for anal sex), condoms, and lubricant were introduced. Also discovered were several pornographic DVD recordings featuring homosexual acts between young-looking males. Other DVDs were recovered in a contemporaneous search of Mr. Keelan's apartment in Roanoke. During the trial, defense counsel failed to object to the introduction of this into evidence despite it amounting to a constructive amendment of the Indictment.

10

Indeed, the jury was provided a mountain of evidence pertaining to the Petitioner's interstate travel to have sex, his reservation of hotel rooms for sex, his purchase of sex toys, his possession of pornography, his rental of kayaks to paddle to an island for sex, his games of chess in his classroom with J.S., his various in-person conversations with J.S. about his sexual orientation, and their use of sex toys, bondage, and other manner and means of engaging in sexual intercourse. Despite the fact that none of this evidence had anything to do with the gravamen of Petitioner's offenses, his counsel did not object to the introduction of any of this evidence on the basis that its use would amount to a constructive amendment of the Indictment.

Prior to trial, the Petitioner also informed trial counsel that he had not "persuaded, induced, or enticed" J.S. to agree to have sex with him because he was certain that J.S. independently made up his mind to have sex with older men prior to even meeting the Petitioner. Indeed, as Petitioner pointed out to his trial counsel, this much was corroborated by a letter J.S. had written to his parents as well as an email to an attorney written by J.S.'s sister. *See* attached Exhibits B and C. Thus, Petitioner specifically asked his defense counsel to subpoena J.S.'s phone records, Facebook accounts, and records from various other social networking websites for evidence that J.S. shared his (J.S.'s) desires with many older men even prior to meeting the Petitioner. Defense counsel failed to do so. It was also known by the defense that J.S. communicated with various older men using his cell phone via text messaging or telephone. Yet, J.S.'s cell phone records were never subpoenaed by the defense.

11

Had Petitioner's counsel undertaken an investigation, subpoenaed records, or compelled such disclosures from the government, such efforts would have revealed a treasure trove of evidence regarding J.S.'s mental state and his relentless pursuit of older men via the internet both before and after he met Petitioner.

Indeed, not only would Petitioner's counsel have discovered evidence relating to J.S.'s communications with Knute Rondum and the others mentioned in his letter, but the defense would have been aware that, at the very time J.S. was testifying before this Court, he was involved in a sexual relationship with a man more than 50 years older than him. Worse, the older man J.S. was dating during Petitioner's trial was well known to other older men who participated in the same internet sex chat rooms as J.S.; so well known, in fact, that he shared pictures of himself and J.S. with a convicted pedophile who is now incarcerated with the Petitioner. *See* Exhibits attached D and E. J.S. married this man after Petitioner's sentencing.

### III. **Summary of Petitioner's claims**

This Court should vacate the Petitioner's conviction and grant him a new trial because his trial counsel was constitutionally ineffective by (1) failing to make a reasonable investigation of the alleged victim's mental state in order to (a) rebut an essential element of the offense, and (b) impeach the victim's testimony; (2) failing to present evidence of the alleged victim's mental state in order to (a) rebut an essential element of the offense, and (b) impeach the victim's testimony; (3) failing to object to the government's introduction of evidence on the basis that it amounted to a constructive amendment of the indictment; and (4) failing to object to legally incorrect jury

12

instructions with respect to the elements of the offense.  This Court should also vacate the Petitioner's convictions and sentence because the government violated his constitutional due process rights (1) by withholding material exculpatory evidence relating to J.S.'s mental state; and (2) because of the prosecutor's outrageous, intentional and improper comments during closing argument.

## MEMORANDUM OF LAW

### I. Petitioner's offense: 18 U.S.C. § 2422(b)

Petitioner was convicted of both violations of 18 U.S.C. § 2422(b) alleged as Counts One and Two of the Indictment.  (DE 7). Count One charged him with "using any facility and means of interstate commerce, that is, the Internet and a cellular telephone, [to] knowingly persuad[e], induc[e], [or] entic[e]" a minor "to engage in sexual activity for which any person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2422(b)."  *Id.*  Count One further alleged that this offense occurred "[b]eginning as early as the fall of 2009, and continuing through the summer of 2011." *Id.*  Count Two charged the petitioner with "using any facility and means of interstate commerce, that is, the Internet and a cellular telephone, [to] knowingly attempt[] to persuad[e], induc[e], [or] entic[e]" a minor "to engage in sexual activity for which any person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2422(b)."  *Id.* Count Two further alleged that this offense occurred,

13

[b]eginning on or about May 9, 2012, and continuing through on or about June 16, 2012." *Id.*[1]

Significantly, section 2422(b) <u>does</u> <u>not</u> require an intent to <u>actually</u> <u>engage</u> in illegal sexual activity with a minor.  Rather, one may violate § 2422(b) merely by intentionally persuading, inducing, or enticing a minor, (or attempting to do so) through the use of a telecommunications device, to engage in illegal sexual activity.  *United States v. Yost*, 479 F.3d 815, 819 n.3 (11th Cir. 2007) (stating that a defendant does not need to act "with the specific intent to engage in sexual activity" to be guilty of violating § 2422(b)).

To be sure, this basic distinction is supported by the legislative history of §2422(b) which reflects Congress's concerns about predators using the Internet to persuade minors to participate in illegal sexual activity. *See*, e.g. 144 CONG. REC. H10571 (daily ed. Oct. 12, 1998) (statement of Rep. Hutchinson).  Thus, and as the Court in *United States v. Dwinells* noted, although "'it may be rare for there to be a separation between the intent to persuade and the follow up intent to perform the act after persuasion, **they are two clearly separate and different intents** and the Congress has made a clear choice [in § 2422(b)] to criminalize persuasion and the attempt to persuade, not the performance of the sexual acts themselves.'" *United*

---

[1] 18 U.S.C. § 2422(b) makes it a crime to "us[e] the mail or any facility of interstate or foreign commerce" (such as a telecommunications device) to "knowingly persuade[], induce[], entice[], or coerce[] any individual who has not attained the age of 18 years, to engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempt[ing] to do so."  18 U.S.C. § 2422(b).  However, as the parties agreed prior to trial that there was no evidence of "coercion," that particular

14

States v. Douglas, 626 F.3d 161, 164 (2d Cir. 2010) (quoting United States v. Bailey, 228 F.3d 637, 639 (6th Cir. 2000)) (emphasis added). See also, United States v. Yost, 479 F.3d 815, 819 n.3 (11th Cir. 2007) (finding that a defendant does not need to act "with the specific intent to engage in sexual activity" to be guilty of violating § 2422(b)).

Stated simply, to establish an offense under 18 USC § 2422(b), the government must prove that an individual: (1) used a facility of interstate commerce; (2) to knowingly persuade, induce, entice or coerce, or attempt[2] to persuade, induce, entice or coerce; (3) any individual who is younger than eighteen-years old; and (4) to engage in sexual activity of a criminal nature.  See 18 USC §2422(b); United States v. Brand, 467 F.3d 179, 201-02 (2d Cir. 2006).  "A conviction under § 2422(b) requires a finding only of an attempt to entice or an intent to entice, and not an intent to perform the sexual act following the persuasion."  Brand, 467 F.3d at 202.  Section 2242(b) "**criminalizes an intentional attempt to achieve a mental state – a minor's assent – regardless of the accused's intentions [concerning] the actual consummation of sexual activities with the minor**."  United States v. Berk, 652 F.3d 132, 140 (1st Cir. 2011) (emphasis added).

---

element is not at issue.  (DE 135 at p. 442).

[2] Federal courts apply the substantial-step test in determining whether a defendant committed a criminal attempt. See, e.g., Gladish, 536 F.3d at 648.  Thus, a defendant "must intend the completed crime and take a 'substantial step' toward its completion." Gladish, 536 F.3d at 648.  In this context, one may attempt to attain a minor's assent to engage in illegal sexual activity through words alone.  See, e.g., United States v. Nestor, 574 F.3d 159, 161 (3d Cir. 2009); ("Nestor evinced his intent to violate § 2422(b) in his e-mails and phone conversations."); United States v. Schmitz, 322 F. App'x 765, 768 (11th Cir. 2009) (holding that the defendant demonstrated her

## II. **Petitioner's Sixth Amendment right to counsel and the *Strickland* standard**

The Sixth Amendment to the United States Constitution requires that, "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense." U.S. Const. amend. VI. *Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963). Of course, "[t]he right to counsel is the right to the effective assistance of counsel" not only at trial, but at all "critical stages" of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (*quoting McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (Counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary).

To establish a claim of ineffective assistance of counsel that rises to the level of being a constitutional violation, the Petitioner must not only prove "that "counsel's performance was deficient," but also that the deficient "performance prejudiced the defense." *Strickland* at 687.  More particularly, the Petitioner must first establish that a reasonably competent attorney would not have committed the error alleged and that there is a reasonable probability that the error affected the outcome of his case. *Id.* at 687, 693. In other words, the error must have affected Petitioner's substantial rights. *See United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007). "A substantial right is affected if . . . there is a reasonable probability that there would have been a different

---

specific intent to violate § 2422(b) by sending "messages expressing her love and desire to pursue a sexual relationship with the minor").

16

result had there been no error." *United States v. Bennett*, 472 F.3d 825, 831–32 (11th Cir. 2006).

Thus, to prevail on a claim of ineffective assistance of counsel, the petitioner must establish: (1) that his counsel's representation fell below an objective standard of reasonableness; and (2) that but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (*en banc*). To establish a Sixth Amendment violation based on ineffective assistance of counsel, the petitioner must point to specific actions or omissions in the record. *United States v. Cronic,* 466 U.S. 648, 665 (1984). The Supreme Court has long used ABA Standards as "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 522 (2003).

### A. Petitioner's trial counsel was constitutionally ineffective for failing to make a reasonable investigation into the alleged victim's mental state in order to obtain evidence necessary to (a) rebut an essential element of the offense, and (b) impeach the victim's testimony.

As charged in this case and as stated, *supra*, Section 2422(b) prohibits using a cellular telephone or the Internet to knowingly "persuade, induce, or entice" a minor to engage in illegal sexual activity; a crime that courts have carefully distinguished from an attempt to actually participate in illegal sexual activity with a minor. 18 U.S.C. § 2422(b); *United States v. Goetzke*, 494 F.3d 1231, 1236 (9th Cir. 2007) (noting the defendant "was charged with attempting to persuade, induce, entice, or coerce [the minor] to engage in sexual activity with him—not with attempting to engage in sexual

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

activity with [the minor]"); *United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006) ("A conviction under § 2422(b) requires a finding only of an attempt to entice or an intent to entice, and not an intent to perform the sexual act following the persuasion."); *United States v. Thomas*, 410 F.3d 1235, 1244 (10th Cir. 2005) ("Section 2422(b) requires only that the defendant intend to entice a minor, not that the defendant intend to commit the underlying sexual act.").

Thus, rather than criminalizing intentional efforts to engage in illegal sexual activity with a minor, "[§] 2422(b) criminalizes an intentional attempt to achieve a mental state - a minor's assent - regardless of the accused's intentions vis-à-vis the actual consummation of sexual activities with the minor." *United States v. Dwinells*, 508 F.3d 63, 71 (1st Cir. 2007), cert. denied, 128 S. Ct. 2961 (2008); *see also Goetzke*, 494 F.3d at 1236 (describing an attempt to persuade under § 2422(b) as "an attempt to achieve the mental act of assent"). In other words, § 2422(b) does not criminalize intentional efforts to have sex with a child; it criminalizes intentional efforts to talk a child into engaging in a sex act regardless of whether the act actually occurs. Thus, the mental state of both the Petitioner and J.S. were at issue.

Well before trial, the Government provided Petitioner's counsel with evidence revealing that J.S. had an affinity for older men, that he had propositioned older men and performed "shows" for them online before meeting Petitioner, and that he engaged in sex acts with dozens of older men on scores of occasions. *See* Exhibits B and C. Petitioner's counsel was also aware that the government had gained access to all of J.S.'s many social media accounts, his email accounts, and his cellular telephone. Most

18

importantly, Petitioner told his trial counsel that he never convinced J.S. to do anything because, quite simply, J.S. needed no convincing.   Rather, it was J.S. who was pursuing and trying to convince Petitioner; not the other way around. (DE 206). Accordingly, Petitioner urged trial counsel to obtain evidence from these sources.  *Id.*

Despite the gravamen of the offense being centered on Petitioner's intent to "achieve a mental state - [J.S.'s] assent," Petitioner's counsel engaged in no investigation into J.S.'s then-existing mental state to show that, during the time periods alleged in the Indictment, J.S. had already attained the requisite mental state without Petitioner's involvement.   Moreover, such information could have served to impeach J.S.'s anticipated testimony about being "groomed" by the Petitioner (whom he had yet to meet) or his statements about being "confused" about his sexual identity.

As the court held in *Strickland* "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.   In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington,* 466 U.S. 691, 104 S. Ct.2052, 2066 (1984).  Here, there can be no justification for Petitioner's counsel to fail to investigate J.S.'s mental state.  Counsel was certainly aware of the elements of the offenses Petitioner was charged with committing and certainly knew that J.S.'s mental state at the time of the offense was at issue. Indeed, J.S.'s then-existing mental state was the issue.  Accordingly, there can be no justification for this failure.

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

**B. Petitioner's trial counsel was constitutionally ineffective for failing to present evidence of the alleged victim's mental state in order to (a) rebut an essential element of the offense, and (b) impeach the victim's testimony.**

As noted, *supra*, under § 2422(b), the conduct, or attempted conduct, that forms the basis of Petitioner's Indictment is not his actual sex with J.S., the minor. "[M]ere contact for the purposes of engaging in illegal sexual activity . . . is not criminalized in 18 U.S.C. § 2422(b)." *United States v. Root*, 296 F.3d 1222, 1230 (11th Cir. 2002). Rather, "the government must prove [Petitioner] intended to <u>cause</u> <u>assent</u> on the part of the minor, not that he acted with the specific intent to engage in sexual activity." *United States v. Lee*, 603 F.3d 904, 914 (11th Cir. 2010) (internal quotation marks and citations omitted). The central issue, therefore, is what the defendant knowingly did over a telecommunications device "toward causing assent" as opposed to whether he and J.S. actually engaged in sexual relations. *Id.*

Petitioner's counsel was constitutionally ineffective for failing to use evidence that J.S. had a well-developed desire to have sex with older men – a desire that he often shared with older men online – and that he needed no persuasion or inducement from the Petitioner. *See* Exhibits B and C. Perhaps even more significantly, the evidence was such that it was J.S. who had a pattern of using the internet to "entice" older men into sex – not the converse. *Id.*

Despite having access to the necessary evidence, Petitioner's counsel never even tried to present evidence of J.S.'s 'mental state" during the time periods alleged in the Indictment. Instead, counsel inexplicably (and erroneously) sought to "introduce evidence establishing that . . . J.S. engaged in *consensual* sexual activity with 40-50

20

individuals, all of the same age and demographic background as Mr. Keelan." (DE 29 at 1 (emphasis added). Of course, and notwithstanding the obvious legal principle that J.S., as a minor, simply cannot "consen[t]" to anything, trial counsel utterly failed to appreciate that, because section 2422(b) does not require an intent to actually engage in illegal sexual activity with a minor, whether or not J.S. engaged in sexual activity with others is beside the point. *See e.g., United States v. Yost*, 479 F.3d 815, 819 n.3 (11th Cir. 2007). Certainly, the Court appreciated this distinction when it denied the Motion, stating that: "the prior sexual activity of JS has no bearing on whether [Mr. Keelan], as charged in the Indictment, 'knowingly attempted to persuade, induce, entice, and coerce" JS to engage in sexual activity with him." (DE 34).

Thus, trial counsel's failure to use evidence of J.S.'s "mental state," (as opposed to J.S.'s actual sexual activities) amounted to constitutionally ineffective representation. Had trial counsel sought to introduce evidence of J.S.'s "mental state" of general assent to pursuing older men online because of his sexual attraction to them – as opposed to his actual sex with them – the Court would have necessarily concluded otherwise. Certainly, the Court knew that J.S.'s "mental state of assent" to sex acts with older men was squarely at issue.

Accordingly, Petitioner's counsel should have sought to introduce evidence of J.S.'s mental state under 404(a)(2)(B) which permits such evidence under the circumstances, or under any number of other possible legal theories. *See e.g., Olden v. Kentucky*, 488 U.S. 227 (1988) and *United States v. Bear Stops*, 997 F.2d 451, 454-457 (8th Cir. 1993) (such evidence admissible where its exclusion would violate a

21

defendant's constitutional rights to confrontation or due process); *Sandoval v. Acevedo*, 996 F.2d 145, 148-149 (7th Cir. 1993) ("A rape shield statute cannot constitutionally be employed to deny the defendant an opportunity to introduce vital evidence, and impeaching evidence can be vital.")(*citing Washington v. Texas*, 388 U.S. 14, 18-19 (1967)); *United States v. Kelly*, 888 F.2d 732, 743 (11th Cir. 1989)("[s]uch discretion does not, however, extend to the exclusion of crucial relevant evidence necessary to establish a valid defense."). Counsel's failure to do so rises to the level of constitutionally ineffective assistance of counsel because no reasonably competent attorney would have attempted to admit J.S.'s "prior sexual activity" in lieu of evidence of his "mental state of assent" and there is a reasonable probability that the error affected the outcome of Petitioner's case. *Strickland* at 687, 693. *See also, United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007) and *United States v. Bennett*, 472 F.3d 825, 831–32 (11th Cir. 2006) ("A substantial right is affected if . . . there is a reasonable probability that there would have been a different result had there been no error.").

### C. Petitioner's trial counsel was constitutionally ineffective for failing to object to the government's introduction of evidence which amounted to a constructive amendment of the indictment.

As noted, Petitioner's Indictment charged him with using "the Internet and a cellular telephone" to knowingly convince (i.e., "persuade, induce, or entice") J.S. to engage in sexual activity in violation of 18 U.S.C. § 2422(b). The Petitioner was not charged with violating 18 U.S.C. § 2422(b) through the use of any other "facility and

22

means of interstate commerce", nor was he charged with engaging in sexual activity with a minor in violation of 18 U.S.C. § 2241(c) – the Federal statutory rape statute.

Despite the narrow charges against Petitioner - and their even narrower scienter requirement - the jury was provided a mountain of evidence pertaining to the Petitioner's interstate travel to have sex, his reservation of hotel rooms for sex, his purchase of sex toys, his possession of pornography, his rental of kayaks to paddle to an island for sex, his games of chess in his classroom with J.S., and his various in-person conversations with J.S. about his sexual orientation, and their use of sex toys, bondage, and other manner and means of engaging in sexual intercourse. Despite the fact that none of this evidence had anything to do with the gravamen of Petitioner's offenses, his counsel did not object to the introduction of any of this evidence on the basis that its use would amount to a constructive amendment of the Indictment. This was error of a constitutional magnitude.

A fundamental principle stemming from the Fifth Amendment is that a defendant can only be convicted for a crime charged in the indictment. *United States v. Keller*, 916 F.2d 628 (11th Cir. 1990); *United States v. Cancelliere*, 69 F.3d 1116 (11th Cir,. 1995). When the evidence at trial deviates from what is alleged in the Indictment, two distinct problems can arise: constructive amendment or variance. *United States v. Flynt*, 15 F.3d 1002 (11th Cir. 1994). Constructive amendment of the indictment is *per se* reversible error. *United States v. Keller*, 916 F.2d 628 (11th Cir. 1990). An amendment occurs when the essential elements of the offense contained in the Indictment are altered to broaden the possible bases for conviction beyond what is

23

contained in the Indictment. *United States v. Dennis* 237 F.3d 1295 (11th Cir. 2001); *United States v. Behety*, 32 F. 3d 503 (11th Cir. 1994); *United States v. Weissman*, 899 F.2d 1111 (11th Cir. 1990).

"Section 2422(b) does not prohibit all communications with a minor; nor does it prohibit all communications that relate to illegal sexual activity." *United States v. Tykarsky*, 446 F.3d 458, 482 (3d Cir. 2006). Unfortunately, Petitioner's counsel did nothing to prevent the government from introducing the mountain of evidence described *supra*, on the basis that it amounted to Petitioner's commission of other uncharged crimes instead of being evidence of the crimes actually charged in the Indictment. Indeed, "persuad[ing], induc[ing], or entic[ing]" J.S. "using the Internet or a cellular telephone," is what was specifically charged in the Indictment and travel, buying sex toys, renting Kayaks or hotel rooms, and playing chess cannot sensibly be characterized as a step towards that, as they are simply not communicative acts that took place on a communication device.

Counsel's failure to object to the foregoing evidence on the basis that it constructively amended the Indictment rises to the level of being constitutionally ineffective assistance of counsel because "there is a reasonable probability," one "sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. *See also Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir. 1991).

24

**D. Petitioner's trial counsel was constitutionally ineffective for failing to object to legally incorrect jury instructions with respect to Count 2.**

Prior to closing arguments, the parties presented the Court with "joint" jury instructions. The instructions the Court gave (as agreed to by the parties) for Count 2 were modified pattern instructions as follows:

> In some cases, it's a crime to attempt to commit an offense – even if the attempt fails. In this case the Defendant is charged in Count 2 of the Indictment with a violation of Title 18, United States Code, Section 2422(b), beginning on or about May 9, 2012, and continuing through on or about June 16, 2012. That Section makes it a Federal crime for anyone, using any facility or means of interstate or foreign commerce, to attempt to persuade, induce, or entice anyone under 18 years old to engage in any sexual activity for which any person could be charged with a criminal offense.

> The Defendant can be found guilty of the offense charged in Count 2 of the Indictment only if all of the following facts are proved beyond a reasonable doubt:

> First:   the Defendant knowingly persuaded. Induced, or enticed J.S. to engage in sexual activity, as charged;
>
> Second:  the Defendant used the internet and a cellular phone to do so;
>
> Third:   when the Defendant did these acts, J.S. was less than 18 years old; and
>
> Fourth:  the individual engaging in the sexual activity could have been charged with a criminal offense under the law of Florida.

> The Defendant can be found guilty of an *attempt* to commit that offense only if both of the following facts are proved beyond a reasonable doubt:
>
> First:   The Defendant knowingly intended to commit the crime of persuading, inducing, or enticing a minor to engage in sexual activity; and
>
> Second:  The Defendant's intent was strongly corroborated by his taking a substantial step towards committing the crime.

25

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

So the Government must prove that one or more of the individuals engaging in the sexual activity could have been charged with a criminal offense under the laws of Florida.

As a matter of law the following acts are crimes under Florida law; Under Florida Statute § 777.04(1), a person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense, but fails in the perpetration or is intercepted or prevented in the execution thereof, commits the offense of criminal attempt. Moreover, under Florida Statute § 794.05, a person commits a crime when the person is 24 years of age or older and engages in sexual activity with a person 16 or 17 years of age.

"Sexual activity," as used in Florida Statute § 794.05, means the oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object; however, sexual activity does not include an act done for a bona fide medical purpose.

(DE 91 at 11-12).

This instruction, **which was agreed to by Petitioner's trial counsel**, was erroneous for two reasons: (1) the section of the instructions containing the pattern instructions for "attempt" misstated the first element by omitting "using the internet and cellular phone" and (2) the instruction gave two choices for "acts [that] are crimes under Florida law" with the first "act" being the Florida crime of "attempt". Thus, by omitting the essential element of "using the internet and cellular phone" from the attempt instruction, the jury could have convicted for an attempt to "persuade, induce, or entice" without using a facility of interstate commerce – an offense not set forth in the Indictment. Moreover, by including two alternative "theories" of Florida Statutes that were violated (one of which being the Florida crime of attempt), the Instructions erroneously provided an obviously improper basis for the jury to convict the Petitioner

26

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

for "attempting" the State offense of attempting to commit any offense prohibited by Florida law. See DE 91 at 11-12.

To establish enticement under 18 USC § 2422(b), the government must prove four elements, that an individual: (1) used a facility of interstate commerce; (2) to knowingly persuade, induce, entice or coerce, or attempt to persuade, induce, entice or coerce; (3) any individual who is younger than eighteen-years old; and (4) to engage in sexual activity of a criminal nature. See 18 USC §2422(b); *United States v. Brand*, 467 F.3d 179, 201-02 (2d Cir. 2006). Adhering to the plain language of § 2422(b) and the legislative intent behind it, courts have recognized that the statute does not additionally require the defendant's intent for the illegal sexual activity to actually take place. *United States v. Yost*, 479 F.3d 815, 819 n.3 (11th Cir. 2007) (stating that a defendant does not need to act "with the specific intent to engage in sexual activity" to be guilty of an attempt under § 2422(b)).

Federal courts apply the substantial-step test to determine whether a defendant committed a criminal attempt. *See, e.g., Gladish*, 536 F.3d at 648; *United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006); *United States v. Thomas*, 410 F.3d 1235, 1245 (10th Cir. 2005). Under this test, a defendant "must intend the completed crime and take a 'substantial step' toward its completion." *Gladish*, 536 F.3d at 648. See also *United States v. Muentes*, 316 F. App'x 921, 923–24 (11th Cir. 2009) ("To sustain a conviction for the crime of attempt, the Government need only prove (1) the defendant had the specific intent to engage in the criminal conduct for which he is charged and (2) he took a substantial step toward commission of the offense.). A defendant may

27

attempt to attain a minor's assent to engage in illegal sexual activity through words alone so long as those words are spoken or written "using any facility or means of interstate or foreign commerce." *See, e.g., United States v. Nestor*, 574 F.3d 159, 161 (3d Cir. 2009) (listing repeated <u>email</u> and <u>telephone</u> conversations about "having sexual contact with children" among the activities that "[i]ndividually . . . could constitute a substantial step toward the violation of § 2442(b)")(emphasis added); *United States v. Schmitz*, 322 F. App'x 765, 768 (11th Cir. 2009) (holding that the defendant demonstrated her specific intent to violate § 2422(b) by sending "<u>messages</u> expressing her love and desire to pursue a sexual relationship with the minor")(emphasis added).

In Petitioner's case, trial counsel's agreement to give this jury instruction for Count 2 without the element of "using the internet and a cellular phone" amounted to the constructive amendment of the Indictment as it permitted the jury to convict the Petitioner for an Federal enticement offense that did not require the very element that provided for Federal jurisdiction: "using any facility or means of interstate or foreign commerce." 18 U.S.C. § 2422(b). A jury instruction that constructively amends an indictment constitutes *per se* reversible error because such an instruction violates a defendant's constitutional right to be tried on only those charges presented in a grand jury indictment, and creates the possibility that the defendant may have been convicted on grounds not alleged in the indictment. *Stirone v. United States*, 361 U.S. 212 (1960); *United Staes v. Cancelliere*, 69 F. 3d 1116 (11th Cir. 1995), *United States v. Narog*, 372 F. 3d 1243 (11th Cir. 2004). An amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for

28

conviction beyond what is contained in the indictment. *United States v. Dennis* 237 F.3d 1295 (11th Cir. 2001); *United States v. Behety*, 32 F. 3d 503 (11th Cir. 1994); *United States v. Weissman,* 899 F.2d 1111 (11th Cir. 1990).

Additionally, the second to last paragraph of the jury instruction provided two alternatives for the element requiring "sexual activity [that] could have been charged [as] a criminal offense under the law of Florida." (DE 91 at 11). The two offenses provided for in the instructions were (1) "Florida Statute § 777.04(1)" which makes it a crime for a person to "attempt to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense" and (2) "Florida Statute § 794.05" which makes it a crime for a person "24 years of age or older [to] engage[] in sexual activity with a person 16 or 17 years of age." (DE 91 at 12).

It was certainly error to instruct the jury that they could convict based on a finding that the defendant attempted to persuade J.S. to attempt to commit a Florida offense, but that is precisely what this jury instruction amounts to, and exactly why it was improper. Indeed, where an offense can be committed in more than one way, and the jury is erroneously instructed about one of the methods, the conviction may not be sustained. *United States v. Martinez*, 14 F.3d 543 (11th Cir. 1994); *United States v. Heller*, 830 F.2d 150 (11th Cir. 1987). Moreover, a jury instruction that fails to properly limit the basis for prosecution may also amount to an improper amendment of the indictment. In *United States v. Artrip*, 942 F. 2d 1568 (11th Cir. 1991), for example, the defendant was charged with defrauding a bank by submitting a financial statement of his wife with overstated assets. *Id.* At trial, proof was introduced of the defendant's

liabilities, which were not listed in the indictment as being part of the fraud. *Id.* The trial court's failure to instruct the jury that the only basis for the charge was overstated assets was reversible error. *Id.* There was a substantial possibility that the jury convicted the defendant of understating liabilities but that was not the charge set forth in the indictment. *Id.*

## III. The Petitioner's Fifth Amendment Due Process rights

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. Under Supreme Court case law interpreting the Fifth Amendment, "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). Simply put, a defendant can be convicted only of a crime charged in the indictment. *United States v. Dortch*, 696 F.3d 1104, 1111 (11th Cir.2012), cert. denied, —— U.S. ——, 133 S.Ct. 993, 184 L.Ed.2d 771 (2013).

It is also a due process violation for the Government to suppress evidence favorable to the accused when that evidence "is material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), or to suppress evidence that goes to the credibility of crucial prosecution witnesses, *see Giglio v. United States*, 405 U.S. 150, 154 (1972). The Supreme Court has long held that the Government has a constitutional duty to disclose exculpatory and impeachment evidence to a criminal defendant in advance of trial. *See Brady v. Maryland*, 373 U.S. 83 (1963).

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

**A. The government withheld evidence of JS's history of baiting older men online and his "mental state".**

It is a violation of due process for the Government to suppress evidence favorable to the accused when that evidence "is material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), or to suppress evidence that goes to the credibility of crucial prosecution witnesses, *see Giglio v. United States*, 405 U.S. 150, 154 (1972). The Supreme Court has long held that the Government has a constitutional duty to disclose exculpatory and impeachment evidence to a criminal defendant in advance of trial. *See Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court made clear in *Kyles v. Whitley*, 514 U.S. 419 (1995), that due process requires the prosecutor to fulfill his obligation of knowing what material, favorable, and exculpatory evidence is in the government's possession and disclosing that evidence to defense counsel:

> Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result.

*Id*. at 439. In order to comply with *Brady*, therefore, "the individual prosecutor <u>has a duty</u> to learn of favorable evidence known to others acting on the government's behalf." *Id*. at 437 (emphasis added). *See also Strickler v. Greene*, 527 U.S. 263, 281 (noting "special role played by the American prosecutor" as one "whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done"). The *Strickler* Court reiterated that a prosecutor has a duty to disclose exculpatory evidence

even though there has been no request by the defendant, **and that the prosecutor has a duty to learn of any favorable evidence known to individuals acting on the government's behalf (such as law enforcement)**. *Id.* at 280-81.

In *Banks v. Dretke*, 124 S. Ct. 1256 (2004), the Supreme Court, in addressing a *Brady* claim, held that "[w]hen police **or** prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight."  Thus, in the words of the Supreme Court, a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 1275.  Under *Banks*, the burden is on the government to "set the record straight," not upon the defense to intuit that the government is holding information back from the defense. *See also Strickler v. Greene*, 527 U.S. 263 (1999).  The Eleventh Circuit has also held that knowledge of falsity of a prosecution witness's testimony is imputed to the prosecution even if the falsity is known by a member of the prosecution team, such as law enforcement. *Williams v. Griswald*, 743 F. 2d 1533 (11th Cir. 1984) ("It is of no consequence that the facts pointed to may only support knowledge of the police because such knowledge will be imputed on the state prosecutors") (*citing Schneider v. Estelle*, 552 F. 2d 593 (5th Cir. 1977); *Smith v. Florida*, 410 F. 2d 1349 (5th Cir. 1969).  *Accord United States v. Antone*, 603 F. 2d 566, 569 (5th Cir. 1979).

In Petitioner's case, the prosecution team (particularly Agent Canon) was in possession of a vast amount of evidence in the form of emails, social media accounts,

and other electronic media evidence that were obtained from J.S. and his family but that were not provided to the defense team in violation of the Fifth Amendment, *Brady,* and its progeny.  These emails, and other communications were not only the best evidence of J.S.'s efforts to entice older men to engage in sexual activity with him, but they were also the best evidence of his "mental state" prior to meeting the Petitioner which was directly at issue with respect to whether he was persuaded, induced, or enticed by the Petitioner.  Certainly, J.S. was, by anyone's definition, the government's "star" witness at trial; his name and his testimony were invoked by the government on practically every page of the government's closing argument. To the extent that whether a constitutional violation has occurred is, in part, measured by the importance of the witness, there can be no question that the suppressed evidence would have drastically altered the trial had it been disclosed.

The Eleventh Circuit has repeatedly recognized that a defendant's confrontation rights are at their zenith "[w]hen the witness the accused seeks to cross-examine is the `star' government witness, providing an essential link in the government's case." *United States v. Calle*, 822 F. 2d 1016, 1020 911th Cir. 1987).  *Accord United States v. Lankford*, 955 F. 2d 1545, 1548 (11th Cir. 1987); *United States v. Summers*, 589 F. 2d 450, 460 (5th Cir. 1979); *United States v. Barrentine*, 591 F. 2d 1069 (5th Cir.), cert. denied, 444 U.S. 990 (1979).  *See also Kittleson v. Dretke*, 426 F. 3d 306, 320 (5th Cir. 2005).   Thus, the suppressed information must be evaluated in light of the effect on the government's case as a whole and the "importance and specificity" of the witness'

testimony. *United States v. Scheer*, 168 F.3d 445, 452-53 (11th Cir. 1999). As the Eleventh Circuit explained:

> In short, [the witness about whom impeachment evidence was withheld] was a crucial prosecution witness. Again, we do not imply that he was the only witness who testified against Scheer, nor do we suggest that there was not other compelling testimony that would support Scheer's conviction. **Rather, it is because of the relative importance of [this witness'] testimony that we view his credibility to the jurors as so fundamental to Sheer's convictions.**

*Id.* at 456 (emphasis added). *Accord Ventura v. Att'y. General*, 419 F. 3d 1269, 1281 (11th Cir. 2005) ("[w]hether the false testimony offered in a particular case could in any reasonable likelihood have affected the judgment of the jury must be analyzed in light of a number of highly context-specific factual considerations, including the importance of the testimony of the falsely testifying witness to the government's case, the nature and significance of the falsehood, and, notably, to what extent the witness's testimony is substantially corroborated by other evidence"). In Petitioner's case, because there is a reasonable probability of a different outcome had the jury known of the information contained in J.S.'s electronic media, Petitioner is entitled to relief.

### B. The prosecutor's improper statements during closing argument amount to a violation of Petitioner's Fifth Amendment Due Process rights

A prosecutor may not intentionally paint for the jury a distorted picture of the realities of a case in order to secure a conviction. *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994). In evaluating whether improper statements by a prosecutor – other than those referring to a defendant's failure to testify – merit reversing a conviction, among the factors considered by the court are (1) the degree to which the challenged remarks

34

have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; (4) the strength of the competent proof to establish the guilt of the accused. *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994); *Walker v. Davis*, 840 F.2d 834 (11th Cir. 1988); *Reese v. Florida Dept. of Corrections*, 675 F.3d 1277 (11th Cir. 2012).

In Petitioner's trial, the prosecutor improperly and knowingly argued facts to the jury that he claimed constituted elements of the offense and that made the Petitioner guilty when, in reality, those facts could not satisfy the elements of the offense. The prosecutor made the following argument:

> . . . I'm here to tell you that this case requires you to ask yourselves one question and one question only. Why. Ask yourselves why. . . . Why did he paly chess with him every single day. . . . Why did [he] reserve all of those motel rooms and pay for those motel rooms. Why would [he] go over near J.S.'s house and pick him up every day and bring him back to that apartment. Why would he pick him up and bring him to those motels. Why would he pick him up and bring him to Oleta River State Park and kayak to that special island of his. Why would he drive all the way down from Virginia to South Florida and why did he bring that arsenal of sex toys and bondage devices with him and why did he stop at that other sex shop in Fort Pierce to buy more sex toys? Why did he do all these things? . . . the answer to any one of these questions is that the defendant did these things even one time, even one of those things, because he wanted to have a relationship with J.S. A relationship that involved sex. And by definition, he is guilty of these crimes.

(DE 136 at p 542-43). The prosecutor also intentionally misstated the law with respect to both enticement counts by not only leaving out the requirement that the Petitioner use "the Internet or a cellular phone", but by misstating the facts necessary to constitute

persuasion, inducement, or enticement.   (DE 136 at 548-556).   For example, the prosecutor argued to the jury that

> . . . so if you find that the defendant at any point through his conversations with J.S., through his friendliness to J.S., through his mentorship with J.S., by agreeing to play chess with J.S. every single day so he wasn't out where he should be with his friends; by picking J.S. up every day and talking to J.S. about his family and driving a wedge between him and his parents; by telling J.S. that he was the only one who really loved him, the only one who really understood him; by talking to J.S. about sex and sexual activity, and sexual experiences, and making J.S. believe that it was okay to have sex with this man, to talk about sex with this man; in fact, by making J.S. believe that he was the only person in the world with whom J.S. could have these conversations; to whom J.S. could trust about the fact that he was gay and the fact that he wanted to have sexual experiences with men, if the defendant did all of those things and by doing those things J.S. became attracted to him, and J.S. agreed and wanted to have sex with him, then by definition he would have enticed J.S.

(DE 136 at p 549-50).  Indeed, the vast majority of the prosecutor's closing statement is a complete misstatement of what the law requires.   Over and over, the prosecutor intentionally used examples of things the Petitioner did with J.S. in person, or things that the Petitioner did on his own, without the use of the Internet or a cellular phone as "proof" that the Petitioner was guilty of violating 18 U.S.C. § 2422(b) when, in reality, none of these things could constitute a violation of the statute.  As a result, Petitioner's Fifth Amendment right to due process was violated and his convictions and sentence vacated.

## IV.   An Evidentiary Hearing is Warranted.

At this juncture, the allegations set forth in Petitioner's § 2255 petition must be accepted as true, *see Blackledge v. Allison*, 431 U.S. 63 (1977), and an evidentiary

36

hearing is required so long as the defendant, in his § 2255 motion, "has made sufficient allegations so that it cannot be *conclusively* stated that he is entitled to no relief." *United States v. Yizar*, 956 F. 2d 230, 234 (11th Cir. 1992) (emphasis in original).   Even in cases where the issues are limited to the statements of a recanting witness, the Eleventh Circuit has emphasized the need for a hearing so that the trier of fact can determine the veracity of the recantation and it can conduct its review on a complete record.  *See Woodrum v. Southern Ry. Co.,*, 750 F. 2d 876, 881 (11th Cir. 1985).   *See also United States v. Fernandez*, 136 F. 3d 1434 (11th Cir. 1998) (reversing District Court's refusal to grant an evidentiary hearing to former Miami-Dade County Police Officer Jose Fernandez based on his Rule 33 claim that a "60 Minutes" episode showed that the government had probably withheld *Brady* material at his trial); *United States v. Gates*, 10 F. 3d 765 (11th Cir. 1993) (reversing District Court for failure to hold hearing on exculpatory affidavit from convicted co-defendant); *United States v. Espinosa-Hernandez*, 918 F. 2d 911 (11th Cir. 1990) (district court erred in not granting evidentiary hearing on motion for new trial alleging government misconduct); *United States v. Schwarz*, 259 F. 3d 59 (2d Cir. 2001) (ordering evidentiary hearing on motion for new trial); *Conley v. United States*, 323 F. 3d 7 (1st Cir. 2003) (*en banc*).  *Cf. United States v. Culliver*, 17 F. 3d 349, 351 (11th Cir. 1994) (granting government appeal of order granting new trial based on a witness's recantation where motion was granted without a full hearing.).

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

**WHEREFORE**, undersigned counsel, respectfully requests this Honorable Court, under the circumstances present in the instant case, vacate Petitioner's conviction and sentence.

Respectfully submitted,

LAW OFFICES OF PAUL D. PETRUZZI, P.A.
169 E. Flagler Street
Suite 1241
Miami, FL 33131
Telephone: (305) 373-6773
Facsimile:  (305) 373-3832
Email: petruzzi-law@msn.com

By:    /s/   Paul Petruzzi
       PAUL D. PETRUZZI, ESQ.
       Florida Bar No. 982059

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 12, 2017, a true and correct copy of this document was furnished by CM/ECF to all counsel of record.

By:    /s/   Paul Petruzzi
       PAUL D. PETRUZZI, ESQ.
       Attorney for Petitioner

LAW OFFICES OF PAUL D. PETRUZZI, P.A.

# EXHIBIT A

## **AFFIDAVIT**

Fort Dix, New Jersey

I, Knute Rondum, being duly sworn, state the following is true and correct:

1.     My name is Knute Rondum. I am currently incarcerated at FCI Fort Dix in New Jersey. My Inmate Number is 83937-083.

2.     I was charged in the United States District Court for the Eastern District of Virginia in *United States v. Knute Rondum*, Case No. 14-CR-168 with Online Coercion and Enticement in violation of 18 U.S.C. § 2422(b). I pleaded guilty and was sentenced to 120 months imprisonment.  My release date is November 17, 2022.

3.     I know Jacob Salzman. He is the same individual depicted in the photo attached hereto as Exhibit A.  The first time I spoke to him was in late 2007 or early 2008.  At the time, Jacob said he was 14 and soon to be 15 years old. I met him online in a gay chatroom where he was seeking older men.

4.     After our initial online introduction, we communicated via Skype and chatted 3 to 4 times a year for several years.

5.     During our online communications, Jacob would often appear with his shirt off to show me his physique while making comments such as "you can see I'm thin and muscular."

6.      During my conversations with Jacob, he also made it obvious to me that he was seeking a romantic relationship with an older man and that he was sexually attracted to older men.  He would often state how older men "turn him on" and implied that he had sex with older men all the time. On occasion, he also told me that he met older men and performed sexual acts with them at movie theaters and that he was satisfied with that type of sexual encounter.

7.      During these conversations, Jacob also often talked about the negative feelings he had towards his family. He told me they were homophobic and said that if they were to find out that he was gay, they would place him in conversion therapy.

8.      In late October 2010, I told Jacob that I was in Naples, Florida, at my aunt's house and he asked me to meet him in person at the Aventura Mall in North Miami.  I declined.

9.      However, in November of 2010, I did ultimately agree to meet Jacob at a service stop on I-75 between Naples and Miami.  Jacob told me that he was 17 years old at the time and that he would be 18 next spring.  We met and talked for an hour to an hour in a half.  During this meeting, Jacob asked me to have sex with him in the car, but I said no because I was afraid of being caught in such a public place.   Even after this meeting when I declined to have sex with him, Jacob continued to pursue me for sex when we spoke.

FURTHER AFFIANT SAYETH NAUGHT.

Knute Rondum

Before me, the undersigned notary public, appeared the person above, reviewed this affidavit and swore under oath that each statement is true to the best of his knowledge, and being duly sworn, executed the affidavit in my presence this 29 day of December , 2016.

Notary Public

**JOHN R. GONZALEZ**
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 10/17/2018

3

# EXHIBIT A



# EXHIBIT B

8/24/11 Wednesday

## Sexual Promiscuity

I want to start off this section by saying that the emotions I felt while writing myself still carried on to here. I will still, though, re-state the reasoning. I want to take accountability for going on sex.com in eighth grade. The story below is that was that we got into a argument and I was still fuming about it. I therefore went on to the computer and typed in fuck.com. My intent for the ~~www~~ ~~sex.com~~ meaning of "fuck" was fuck you, not in the sense as let's who I was. Therefore surprised to see sex.com pop up and ~~sex~~ immediately got off the computer. Later, when my dad found out and confronted me about it, I lied and blamed ____ for typing it in. I really typed it and take accountability for that.

Before I go into actual details, I want to say that I do not know specific sites or last names. Verify, you do so that shouldn't be a problem/issue. My first experience with ~~with~~ older men was with ____. We both seemed to share common interests. At first, all we did was talk. A couple of months into the tenth grade school year, I would go into his room and talk or play chess during lunch. I did not have sex with him then or have any physical contact. Anyway, things began to get more personal

727

when he found out about my cutting. When he confronted me about it, he told me not to do it and to call him if I had feelings akin to that. He kinda freak out. When you guys did that I liked that. Of course now it's normal for not certain to happen. After, we started talking on the phone every night like into the night and text as well.

When I left the school three-quarter into the school year, things again began to change. Keola started using several ewords and wanted to see if I took the bait or not. I had two choice: either take the bait or see the warning signs and stay on or take the bait. I, too chose the latter. Once I took the bait, we started talking about sex. Eventually, we agreed on a meeting place, and he would pick me up there. The first time he picked me up, we went to his apartment and just talked. We didn't do anything sexual at that time. However, the very next day I was in his apartment and we then had to sex. We had oral and anal. I felt weird, bad weird, but didn't think much of it at the time. From then on, we would have sex quite a few times. Although I don't remember all the times, I will recall a few.

I take the accountability for skipping school one day and going with Keola and to ? both times (this was the first and last time I ever skipped school). He picked me up at Home Depot and we went to ? both times

③

from there. We went hanging and had sex on one of the islands. Later that day, you got a phone call from the school saying I wasn't there that day, and, when confronted about it, I lied and said I was in a different classroom. I take accountability for the times during the summer when I said I was at tennis and I really was with Keelan. I ~~did~~ did that four times I would play tennis till one, and then leave and Keelan would pick me up from there and we would go to his apartment to have sex. Even after he left to Virginia, when he would visit us in miami, I would meet up with him and have sex in some motel. The first time I had sex with Keelan, or any other older man for that matter, in a hotel was so right before he left left for Virginia. We stopped at the motel right before the highway on 167th and had sex there. Later the world we'd visit miami, we would have sex in a motel he was staying in thirty minutes away. I take accountability for all these and any other times I slept with him. I did those acts for freedom, for love and belonging and power and control. It was power and the control for the fact that I had my body and no one but him/you, could take that away from me. It was freedom since I was doing an act that was prohibited especially in Islam. It was freedom since no one told me to stop and I had the choice to commit the act, the most important person, Keelan, was/his love and belonging. I was already feeling isolated and lonely from the fam

and community. You guys looked down about upon me and would rule - but seal about me not following torah law (kosher, garments, dating girls etc). However, more importantly, though, you didn't give me what I needed. I don't mean clothes, food, basics, etc (I thank you for you properly for that!) I mean strictwith, expressing my emotions and unconditional love. For example you didn't let me wear my own clothes or listen to my own music. You also didn't like that when I got angry and would lash when I expressed it. Also, even though you said you love me unconditionally, your actions didn't express it. You would take offence to yourselves, even to bad, anywhere I would eat now when you wouldn't want me to put white above an hispanic! It also didn't help that you told me, or did everyone else in the family, that you wouldn't talk to me if I married a non jew. That scared me, since I knew I had feelings for other men. I wouldn't but tell you that since if that is your reaction to a non jewish girl, I didn't even want to fathom what it would be for a gay guy! those are the reasons I had sex with older men, they filled the gap you couldn't fill. Back on track, Hasdan was able to just my father. He told me things you couldn't at the time. He accepted me as I was when you didn't. He knew what was I needed to fill while you tried not to treat it all. He couldn't give

alleas, which also started with a-z + took onto something and started searching there as well. Although I used both facebook; gay.com, I used facebook more. From both websites I was able to find a plethora of older men at first, I sexted with most of them, went all though. After that, I moved on to web-cams I would Skype set-up a Skype account and let anyone who wanted to see look-see. I didn't care who saw and watched at that point. I first started with plain masterbation, then moved on to props and toys. I sometimes dressed up in-lingerie, heels, etc. I also used a dildo a lot. Doug

⑦

I thought pretty positive. I [illegible] them should pretty [illegible] of my own [illegible] the most common things was the hair color. Most people [illegible] thing that live in our bathroom. Don't worry, I didn't pull them back!! I have them cut? I told [illegible] like that from people anywhere in the world I know for a fact, too to be exact because, one of them was from Indon. I mostly [illegible] those cuts/kills for the emphasis to [illegible]

After sorting and videoing, I moved on to [illegible] the people I actually had sex with were: [illegible] (screen name was [illegible]), another michel, anthony, Noel, [illegible], and [illegible] but I don't know their [illegible] last name, I was asked no do I think they would have given me it.

[left margin: Partial Sentence]   I am pretty sure the last guy after [illegible] was michel [illegible] miami (from an on a gay like [illegible] as m4m), I met him through [illegible] and decided to pursue it. We talked and after about a week we decided to meet up. He asked we where, and I said at the hotel on 16th. He got a room and, [illegible] after school [illegible] we went and had sex there. The next time was a month or two later [illegible] I'm not sure [illegible] he was also the [illegible] one it. I wanted to meet with him again, so and see. I told him one evening in the morning. That night I snuck out of the house. I mostly [illegible] [illegible] would rush at but told. It was also the only time I snuck out of the house. It was [illegible] in [illegible] out so I took [illegible] with me so he couldn't get freaked out and back, too [illegible] look him for protection out that to [illegible] be mad of it. Anyway I snuck out and we went to his house. [illegible]

730

⑧

we had sex and I came home at about five in the
morning. I take accountability for that. I only ~~slept~~ met with
him two more times. The next time was during the summer.

I skipped Sat class (I only did the twice once with prisoner the other
with Kaelyn) & went with ~~his~~ to his house again. I
honestly ~~thought~~ was extremely tired so I actually fell asleep. I woke
up two hours later and realized I had to go. I asked him
~~about~~ why he didn't wake me up and he said b/c
I looked so tired. He also said that he cuddled with me and took a
picture while I was asleep (ok.). Anyway, I didn't sleep with
him that time but ~~[scribbled out]~~ but next time. The last
time I slept with him was during ~~[scribbled]~~ Saturday ~~[scribbled]~~
review. I went most of the time but only skipped three
times (or two times ~~[unclear]~~ even a Saturday review class). Again,
we met up and went to his house and had sex. We were
supposed to meet up again, but the FBI came & and
prevented that.

Michael:  Another incident. I met with him on facebook. He was
too ~~[unclear]~~ I said I'm not playing back. I lied because I didn't
want you to know I was looking up other guys on the
internet. I hung out with Wayne a lot, but only used Wayne
as an excuse for other men. Those three two times were
for Michael ~~[unclear]~~. The first time, after talking, we decided to
meet up at ~~[unclear]~~. He picked me up and from there
we went to ~~[unclear]~~ Ft. Lauderdale. There he had a condo. We had
sex there and afterwards he dropped me off at Walmart. The second
time we met up ~~[unclear]~~ was a couple of months later. I told
you, mom~~, dad,~~ that I was going to to meet Wayne at

⑨

walked with her from there ... to his hotel, but even tho it was Saturday night and you were sleeping, but you still let me go. I take accountability for ... feeling on bad, pushed ... from there we went to his condo. We had sex and slept, then we woke up and, once I left his home, we went out to eat something. Afterwards, we came back had sex again and then I came back home. That was the last time I had sex with him.

Niels: I met Niels online and we began chatting. We talked a lot and kept talking for about a week or two after, we ... I told him I was going to ... doing the summer. He lived in Washington state (right above Cali) and we decided to meet him. Once in Cali, I ... he got a room in the hotel we were staying in. This was the instance when I disappeared for one hour and forty-two minutes. I told you I was going to work out and left to go to his room instead. My phone was dying and I pulled thinking instead of it. After going into his room we talked for ten minutes and then had sex. After realizing the time, I said I had to go and then we proceeded back to our room knowing that I was confronted by you and Yes I had said you called security and he was looking for me. I told you I went to work out but then confessed the truth. Although you didn't believe me, there was nothing else you could do I take accountability for lying to you. That was the only time I had sex with Niels, though we kept talking afterwards.

Richard: I met Richard on gay.com. At first we talked back and forth and videos. We kept on making plans to meet but ...

731

10

I kept canceling since I was actually able to hang out with my real friends at the times, so we planned on meeting. Eventually, we set a day to meet on a Saturday night at Joe's house. After you dropped me off I waited for Hyrbland to come. He came a bit later and from there we went to the beach. We didn't do anything here and we then proceeded to Shingista eat. He said he hadn't eaten all day and he was hungry, I already ate so I just sat there listening to him for about forty minutes. After, I was pretty late, so I had him take me home. Before we got home though I told him to stop in the parking lot of home depot. Even though I was tired (it was pretty late) I didn't want this night to be a total waste. All I did was give him a blowjob in the car in the parking lot. After he dropped me off a block from the home and I walked home. That was the last time I did anything with him. We did talk but rarely and eventually I lost contact with him.

Days I met Day online and, as usual, started talking. With him, I made dates to meet but never had the time to go through with them. Eventually, we made I met with him three or four times. The first time was bad the weather ruined it so I said I am going to meet William, but William actually cancelled when I was on the bus ride there. I then called Day and we arranged to meet at the mall. At the mall, we got tickets to see a movie (one I already had seen). In the theater, we sat in the back row. Of the early evening, we started jacking each other off. After the movie I headed back home. The next time we met we tried to go see a comedy review class but when I got to the school, the school was closed since I was on the weekend.

before we left, I tired of going back home, & decided to either wait for friends to show up (Fins we weren't told of 16.35 the day before) or call day friends should up, but left office heading to Saturday school. One of friends left, & called Doug. He picked one up at the bus stop and from there he went to his apartment. He lived pretty far away, we got to his place and had sex. After, we went out to eat and then he dropped me off about a block from home. The last time I saw Doug was going a Saturday movie theater. This time we went by the 5 amy? we walk wall. We got a ticket for see Jenkins ticket? I don't — Jenkins (what I include same with wayne) We again, jack off in the theater. After, we got a bite to eat. Then we went to his condo again, had sex and then I came home. I recall how silly this guy didn't know what to say, big old had to tell everyone, before

Anthony: I met him online as well and we talked at first Since he didn't live in Florida, i hardly forgot where he lives, we didn't meet until very more recently. Basically, we made plans for when he comes down to Florida, where to meet. Right before we met, I told him what hotel to stay in (the 167?). When he got here & told you guys I was going to tennis play tennis after school. After school, I went straight to the hotel. When I was leaving, Mom asked me where I was going, so I told her I was going to play tennis at Love. I told her I was going to get something to eat and I will play after. I then proceeded on to the hotel. I got to the hotel and went to his room around. We talked for about ten minutes then

732

(12)

*the wording and I would like today talk to how late into the night*

we had sex. After, I walked back to school and
did start to play tennis for an hour. Once I got home,
I heard that Dad was looking for me after school let
out. After being confronted, I lied and said I went
out to eat with school and Jesse. I didn't actually
go out to eat, that was the last guy I had sex
with.

Other guys: There were other guys that I talked with once
the others the first permanent ones, though, were
Kevin, Bruce and Mark.

   Kevin: all I did with Kevin was talked. He frequently,
I think, knows a body guy. We did meet once, though.
He said he would be in Florida for a month. During
that time we made if so we would meet here eventually,
most of all we did was talk. I texted him about
two hours, and said I had to go. When the topic of
sex was brought up by me he wouldn't because
another and, since he wouldn't want to go to
jail from the texts, I say.

— Mark: Again, we talked. He lived in a different
State, So we never meet up. It was tiny that we have love
with him over sext and all.

— Bruce: Honestly, he was being at his residence, I
actually never had sex or anything of the sort with Bruce.
I might have sent a picture once but that was it. Yes,
we talked, but it was actually on par with Mark
with talking of the things he, though, is that I gave
him money. I did something I have never done and

(13)

civil war broke out. I took approx 1250 dollars from you and gave 7 to Bruce. I did this for a couple of reasons. The first, I was pissed at you guys at the party, and second, he said he needed the money, and we split. I figured that Sam now spends a ridiculous amount of money everyday. 1250 was relatively small too just compared to Sam's receipts than so, I felt guilty everytime I stole from you, even Dad. In fact, I still feel guilty now. I just want to say that the selling lady on Skid was actually paid for this. It was for us and my family. Sam and I by pizza and cheese food and still have money left over for another ____

There were other guys I talked with online and stuff, but only for a week or a small amount of time. I honestly don't remember all of them, but I didn't do anything major with them so except for the ones I mentioned. I take accountability for all the things I did with the older men. I take accountability for all the times I lied to you to see the older men. I also take accountability for all the stress I caused you and the family. This has costs so much for therapists and then for the CPT and her afraid ____ going to baby in Keds. I take that too I could have been severely hurt just up, beat up or killed — and could have gotten painful injuries and those things from the sexual contact — AIDS, other herpes, etc. I also put the the family in jeopardy. I by locked on ____ where we lived

____ I just want to ____ clearly a ____ few

(14)

details. No the first I said I was with Drew and later
with wayne, then you called the cops. Since my phone died out
there was a miscommunication for when I was coming home,
I was really with Sayds I also wrote you saying that I
~~[scribbled out]~~ You have all the accounts I
had. I honestly don't remember all of them.
I just want to say I also used yahoo messenger
to talk to with these older men

# EXHIBIT C



Elyse S█████ < elyses█████@gmail.com>

## Re: Confidential J████ S█████

Elyse S█████, Esq.< elyse█████@gmail.com>                    Thu, Aug 25, 2011 at 4:24 PM
To: david@seltzerlaw.com

Dear Mr. Seltzer,

My brother, J████ S█████, has been a victim of sexual abuse by pedophiles. One of them is named Thomas Keelan, who was his high school English teacher when J████ was 14-15. Keelan continued the sexual abuse even though Keelan switched schools and now lives/teaches in Virginia. J████ had sexual chats, sexting, pics, and videos where these pedophiles asked him to do sexual tricks via skype and yahoo messenger. He met many of these men on facebook and dating websites like gay.com or sex.com. J████ is now 16 years old and is currently at a therapeutic camp in Georgia.

Keelan is militantly gay and proud former Catholic, groomed J████ to hate Jews, women, any form of religion/morality/legal authority that would shun or prevent them being together. J████ started cutting himself, becoming depressed, stopped eating, and at one point had suicidal tendencies during the beginning of Keelan's abuse. We sent J████ to therapy but it did not help the depression. J████ now proudly claims he is gay (which he defines as love between an old man and young boy), hates the police and United States government (because they could prosecute or harm his protected abusers), and from being the top student in school now wants to drop out of high school and run away. J████ told my mother that he had been with between 40-50 pedophiles this year alone and in more hotels than he can remember. J████ than denied everything to the police because he felt allegiance to these pedophiles and wanted to protect them. Last night, J████ wrote a letter to my parents admitting to some of the abuse.

We do not know how to access the sexual pictures, videos, etc. that J████ posted and or accepted from the pedophiles. The State Attorney General's office is involved to an extent and they are trying to make a police sting using some of J████'s email accounts. However, there are many accounts that they have not accessed as of yet that have highly important content in them and we do not know how to access these accounts either.

I am attaching the letter my brother sent my parents last night from camp. There are 14 pages. I also was able to get some emails between J████ and these pedophiles as well. Please contact my father, Dr. Carl S█████, at 786-███-████ or z█████@yahoo.com. I told him that I contacted a lawyer but if you wouldn't mind just introducing yourself when you call. My parents are obviously going through trauma and grief. They are not aware of their legal options in civil suit or that they could even sue civilly in this case.

Thank you for your time.

Sincerely,

Elyse

**14 attachments**

jaclet1.jpg
337K

755

# EXHIBIT D



Miami Zoo
3/14/2013

Art &
Jacob

# EXHIBIT E

Miami Book Fair
11/18/2012
Art of Jacob